IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 WAP 2017 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellee | : | Court entered on 8/2/16 at No. 1136 |
| | : | WDA 2014, affirming the order of the |
| | : | Court of Common Pleas of Allegheny |
| | : | County entered 2/21/14 at Nos. CP-02- |
| v. | : | CR-0006621-2012, CP-02-CR- |
| | : | 0003870-2013, CP-02-CR-0004264- |
| JAMAL KNOX, | : | 2013 |
| | : | |
| Appellant | : | ARGUED: November 28, 2017 |

***OPINION***

**CHIEF JUSTICE SAYLOR**                    **DECIDED: AUGUST 21, 2018**

In this appeal by allowance, we address whether the First Amendment to the United States Constitution permits the imposition of criminal liability based on the publication of a rap-music video containing threatening lyrics directed to named law enforcement officers.

In April 2012, Pittsburgh Police Officer Michael Kosko initiated a routine traffic stop of a vehicle driven by Appellant. Appellant's co-defendant, Rashee Beasley, was in the front passenger seat. While Officer Kosko was questioning Appellant, the latter sped away, ultimately crashing his vehicle. He and Beasley fled on foot, but were quickly apprehended and placed under arrest. The police found fifteen stamp bags containing heroin and a large sum of cash on Appellant's person, as well as a loaded,

stolen firearm on the driver's-side floor of the vehicle. At the scene of the arrest, Appellant gave the police a false name. When Detective Daniel Zeltner, who was familiar with both Appellant and Beasley, arrived, he informed the officers that Appellant's real name was Jamal Knox.

Based on these events, Appellant and Beasley were charged with a number of offenses. Officer Kosko and Detective Zeltner, both of Zone 5 of the Pittsburgh Police Department, were scheduled to testify against them in connection with the charges.

While the charges were pending, Appellant and Beasley wrote and recorded a rap song entitled, "F--k the Police," which was put on video with still photos of Appellant and Beasley displayed in a montage. In the photos, the two are looking into the camera and motioning as if firing weapons. The video was uploaded to YouTube by a third party, and the YouTube link was placed on a publicly-viewable Facebook page entitled "Beaz Mooga," which the trial evidence strongly suggested belonged to Beasley.

The song's lyrics express hatred toward the Pittsburgh police. As well, they contain descriptions of killing police informants and police officers. In this latter regard, the lyrics refer to Officer Kosko and Detective Zeltner by name. They suggest Appellant and Beasley know when those officers' shifts end and that the crimes depicted in the song may occur in the officers' homes ("where you sleep"). The lyrics also contain a reference to Richard Poplawski, who several years earlier had strapped himself with weapons and murdered three Pittsburgh police officers. *See Commonwealth v. Poplawski*, 634 Pa. 517, 130 A.3d 697 (2015). Finally, the song includes background sounds of gunfire and police sirens.

In light of the present issue – whether the song communicated a "true threat" falling outside First Amendment protections – we reproduce the lyrics in full without alteration, although they include violent imagery and numerous expletives:

Chorus:

*If y'all want beef we can beef/I got artillery to shake the mother fuckin' streets/If y'all want beef we can beef/I got artillery to shake the mother fuckin' streets.*

*You dirty bitches won't keep knockin' my riches/This ghetto superstar committee ain't wit it/Fuck the Police/You dirty bitches won't keep knockin' my riches/This ghetto superstar committee ain't wit it/Fuck the Police.*

Verse 1 – Mayhem Mal, *i.e.*, Jamal Knox:

*This first verse is for Officer Zeltner and all you fed force bitches/And Mr. Kosko, you can suck my dick you keep on knocking my riches/You want beef, well cracker I'm wit it, that whole department can get it/All these soldiers in my committee gonna fuck over you bitches/Fuck the, fuck the police, bitch, I said it loud.*

*The fuckin' city can't stop me/Y'all gonna need Jesus to bring me down/And he ain't fuckin' wit you dirty devils/We makin' prank calls, as soon as you bitches come we bustin' heavy metal.*

*So now they gonna chase me through these streets/And I'ma jam this rusty knife all in his guts and chop his feet/You taking money away from Beaz and all my shit away from me/Well your shift over at three and I'm gonna fuck up where you sleep.*

*Hello Breezos got you watching my moves and talkin' 'bout me to your partner/I'm watchin' you too, bitch I see better when it's darker/Highland Park gone be Jurassic Park, keep fuckin' wit me/Hey yo Beaz call Dre and Sweet and get them two 23's/It's Mayhem.*

(Chorus repeats)

Verse 2 – Soldier Beaz, *i.e.*, Rashee Beasley:

*The cops be on my dick like a rubber when I'm fuckin'/So them bitches better run and duck for cover when I'm buckin'/Ghetto superstar committee bitch we ain't scared of nothing/I keep a forty on my waist, that'll wet you like a mop nigga/Clip filled to the tippy top wit some cop killas/Fuck the police, they bring us no peace/That's why I keep my heat when I'm roamin' through these streets.*

*Cause if you jump out it's gonna be a dump out/I got my Glock and best believe that dog gonna pull that pump out/And I'm hittin' ya chest, don't tell me stop cuz I'm resisting arrest.*

*I ain't really a rapper dog, but I spit wit the best/I ain't carry no 38 dog, I spit with a tec/That like fifty shots nigga, that's enough to hit one cop on 50 blocks nigga/I said fuck the cops nigga/They got me sittin' in a cell, watchin' my life just pass me, but I ain't wit that shit/Like Poplawski I'm strapped nasty.*

(Chorus repeats)

Verse 3 – Mayhem Mal, *i.e.*, Jamal Knox:

*They killed Ryan, and ever since then I've been muggin' you bitches/My Northview niggas they don't fuck wit you bitches, I hate your fuckin' guts, I hate y'all/My momma told me not to put this on CD, but I'm gonna make this fuckin' city believe me, so nigga turn me up.*

*If Dre was here they wouldn't fuck wit dis here/Los in the army, when he comes back it's real nigga, you bootin' up/Fuck the police, I said it loud, we'll repeat that/Fuck the police, I'm blowin' loud with my seat back.*

*They tunin' in, well Mr. Fed, if you can hear me bitch/Go tell your daddy that we're boomin' bricks/And them informants that you got, gonna be layin' in the box/And I know exactly who workin', and I'm gonna kill him wit a Glock/Quote that.*

*Cause when you find that pussy layin' in the street/Look at the shells and put my shit on repeat, and that's on Jesus' blood/Let's kill these cops cuz they don't do us no good/Pullin' your Glock out cause I live in the hood/You dirty bitches, bitch!*

(Chorus repeats)

Officer Aaron Spangler, also of Zone 5, discovered the video while monitoring the "Beaz Mooga" Facebook page. He alerted other police personnel, including Officer Kosko and Detective Zeltner, who watched the video. Thereafter, Appellant was again arrested and charged with, *inter alia*, two counts each of terroristic threats pursuant to

Section 2706(a)(1) of the Crimes Code, and witness intimidation pursuant to Section 4952(a) of the Crimes Code.[1]

A consolidated bench trial on both sets of charges (as well as a third set of charges which is not presently relevant) ensued at which the Commonwealth introduced the video into evidence without objection and played it for the court. *See* N.T., Nov. 13, 2013, at 203, 205.[2] Officer Spangler testified that he had spent time interacting with

---

[1] Terroristic threats is defined, in relevant part, as follows:

> **(a) Offense defined.**--A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another. . . .

18 Pa.C.S. §2706(a)(1). The Crimes Code defines witness intimidation as follows:

> **(a) Offense defined.**--A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to: (1) Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge concerning any information, document or thing relating to the commission of a crime. (2) Give any false or misleading information or testimony relating to the commission of any crime to any law enforcement officer, prosecuting official or judge. (3) Withhold any testimony, information, document or thing relating to the commission of a crime from any law enforcement officer, prosecuting official or judge. (4) Give any false or misleading information or testimony or refrain from giving any testimony, information, document or thing, relating to the commission of a crime, to an attorney representing a criminal defendant. (5) Elude, evade or ignore any request to appear or legal process summoning him to appear to testify or supply evidence. (6) Absent himself from any proceeding or investigation to which he has been legally summoned.

*Id.* §4952(a).

[2] There is one consecutively-numbered trial transcript which covers five separate days of proceedings spanning from November 12-23, 2013.

individuals in the relevant neighborhood and had learned some of their street slang. He indicated that "busting heavy" means to shoot many rounds; a "tec" is a TEC-9, a semi-automatic pistol which holds a large-capacity magazine; to "spit with a tec" means to shoot with a TEC-9; a "cop killa" is a type of bullet that can pierce armored vests; and "strapped nasty" means carrying multiple weapons. *See* N.T., Nov. 13, 2013, at 200-02, 238. With regard to the lyric, "Hello Breezos got you watching my moves," Officer Spangler explained that *Hello Breezos* was the title of an earlier rap song by Appellant and Beasley, and that a "breezo" is a "brick" of heroin consisting of 50 stamp bags. *See id.* at 180-82, 186.

In terms of the song's effects, Officer Kosko testified that when he heard it he was "shocked" and it made him "nervous." He cited it as one of the reasons he decided to leave the Pittsburgh police force and relocate. *See id.* at 107, 109. For his part, Detective Zeltner stated he found the video "very upsetting," and that it made him concerned for his safety as well as that of his family and fellow officers. *Id.* at 147. He explained that extra personnel had to be assigned to Zone 5 to deal with "the threat." *Id.* As well, the detective was given time off and a security detail. *See id.*

By the conclusion of the trial, it became clear that the rap song was the sole basis on which the Commonwealth sought convictions for witness intimidation and terroristic threats. In his summation, therefore, Appellant argued that the song was protected speech, and hence, any conviction based on it would violate his First Amendment rights. *See* N.T., Nov. 19, 2013, at 437-39, 442. The trial court rejected this argument and found him guilty on both counts of witness intimidation and terroristic threats. *See* N.T., Nov. 21, 2013, at 462-64. In reaching its verdict on the witness intimidation counts, the court found beyond a reasonable doubt that Appellant and Beasley specifically intended to intimidate the officers so as to obstruct the

administration of criminal justice, and that they did so in collaboration with one another. *See id.* at 463. The court also found Appellant guilty of, *inter alia*, possessing with intent to deliver a controlled substance. *See id.* at 461; 35 Pa.C.S. §780-113(a)(30).

In his Rule 1925(b) statement, Appellant renewed his contention that the video was constitutionally protected speech, and also claimed there was insufficient evidence that he had the requisite *mens rea* to commit terroristic threats and witness intimidation, as he was allegedly unaware the video would be posted online. *See* Common Pleas Dkt. No. 30, at 1-2. The trial court rejected these claims. As to the First Amendment issue, the court held the song amounted to a "true threat directed to the victims"; as such, the court concluded it was not protected speech. *Commonwealth v. Knox*, Nos. 201206621, 201303870, 201304264, *slip op.* at 19-20 (C.P. Allegheny Aug. 11, 2015).

The Superior Court affirmed in a memorandum opinion. *See Commonwealth v. Knox*, No. 1136 WDA 2014, *slip op.* (Pa. Super. Aug. 2, 2016). Addressing the *mens rea* claim first, the court explained that the Commonwealth was required to establish that Appellant acted at least knowingly with respect to each element of each offense. *See id.* at 8.[3] Based on trial evidence suggesting a prior course of conduct in which Appellant and Beasley made rap videos which Beasley would then publish online, the Superior Court concluded there was sufficient evidence to support a finding that Appellant was aware that the video in question would be posted to a publicly-viewable Internet site and seen by the police. *See id.* at 10.

---

[3] Although the court observed that the *mens rea* for a terroristic threats conviction is an intent to terrorize, whereas the scienter threshold for witness intimidation is knowledge or intent to impede the administration of justice, for reasons that remain unclear it proceeded to consider both offenses under the less-exacting "knowingly" standard. *See id.* at 7-8. *See generally* 18 Pa.C.S. §302(b) (defining levels of culpability, including intentional and knowing conduct). The intermediate court also overlooked that the trial court had found Appellant acted intentionally with respect to witness intimidation.

The Superior Court next rejected Appellant's First Amendment claim, albeit on different grounds than the trial court. The intermediate court characterized Appellant's argument solely as a contention that the video was inadmissible at trial due to its purportedly protected status under the First Amendment. Any such argument was waived, the court explained, as Appellant had not lodged a contemporaneous objection when the video was admitted. *See id.* at 10-11. Notably, the Superior Court did not evaluate whether the song comprised protected speech.[4]

Appellant petitioned for further review, raising the same two issues. We denied the petition in relation to the sufficiency challenge, but granted review limited to the issue of whether the rap video "constitutes protected free speech or a true threat punishable by criminal sanction." *Commonwealth v. Knox*, ___ Pa. ___, 165 A.3d 887 (2017) (*per curiam*).[5] As the question of whether a statement constitutes a true threat is circumstance-dependent, Appellant raises a mixed question of fact and law. Thus, we defer to the trial court's fact findings which are supported by competent evidence and

---

[4] In this latter regard we observe that, at times during this litigation, Appellant has appeared to labor under the belief that a person's speech is inadmissible at trial if it is constitutionally protected expression. There is no rule of evidence in Pennsylvania to that effect. Still, the substantive issue of whether the First Amendment prohibits the imposition of criminal liability based on the rap song was raised at trial and in Appellant's Rule 1925(b) statement, and argued to the Superior Court. *See, e.g.*, Brief for Appellant, *Commonwealth v. Knox*, 1136 WDA 2014, at 37-45.

[5] Perhaps because of the Superior Court's waiver emphasis, in his framing of this issue Appellant suggested his First Amendment claim was "of such substantial importance" that this Court should overlook any purported waiver. *Id.* Constitutional claims are subject to waiver regardless of their importance. *See, e.g.*, *Commonwealth v. Peterkin*, 511 Pa. 299, 310-11, 513 A.2d 373, 378 (1986); *Commonwealth v. Romberger*, 474 Pa. 190, 197, 378 A.2d 283, 286 (1977). Nevertheless, and as explained, Appellant has not waived his First Amendment claim. *See supra* note 4; *see also* Brief for Appellee at 20 (reflecting the Commonwealth's concurrence that Appellant has preserved his First Amendment claim).

resolve any legal questions, such as the scope of the true-threat doctrine, *de novo*. *See Commonwealth v. Batts*, 640 Pa. 401, 444, 163 A.3d 410, 435-36 (2017). In conducting our review, we independently examine the whole record. *See In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 590 Pa. 431, 440, 913 A.2d 178, 183 (2006).

Appellant denies he intended to threaten the police. His assertion in this regard has two conceptually distinct facets, which at times he intermixes. The first relates to whether the evidence adequately demonstrated that Appellant intended for the video to be uploaded to the Internet and viewed by the police. *See* Brief for Appellant at 31-36; *see also id.* at 42 (suggesting Appellant acted at most recklessly in relation to the video's online publication). The second involves a contention that the song was merely artistic in nature and was never meant to be interpreted literally. In this latter regard, Appellant states that he

> consider[s] himself a poet, musician, and entertainer. Rap music serve[s] as his vehicle for self-expression, self-realization, economic gain, inspiring pride and respect from . . . peers, and speaking on public issues including police violence, on behalf of himself and others . . ..

*Id.* at 37; *see also id.* at 42 (urging that "rap is art, an expressive outlet for traditionally disenfranchised groups").

Appellant is supported by several *amici* who make similar observations. The ACLU of Pennsylvania argues that artistic expression "has the power to shock," and this is particularly true with rap, which is sometimes "saturated with outrageous boasts and violent metaphors." Brief for *Amicus* ACLU of Pa. at 11; *cf. id.* at 19 (describing rap as a means for those who disagree with the status quo to vent their frustrations, thereby lowering the likelihood they will engage in physical violence).

The Defender Association of Philadelphia questions whether the trial court's interpretation of street language in the rap video as conveying a literal threat was

methodologically sound. The Association advocates that the video should not have been seen as "autobiography," but as "art, poetry, and fantasy" addressing social issues. Brief for *Amicus* Defender Ass'n of Phila. at 15, 18; *see also id.* at 15-16 (arguing that rap is fiction aimed at projecting images – such as hustlers, gangsters, or mercenary soldiers – and that a "recurring rap genre" involves the "first person homicidal revenge fantasy" (internal quotation marks and citation omitted)). The Association adds that Appellant's status as a semi-professional rap artist with a distinct rap persona ("Mayhem Mal") should have been taken into account as a contextual factor suggesting Appellant did not intend to communicate an actual threat. *See id.* at 18.

The Thomas Jefferson Center for the Protection of Free Expression and the Marion B. Brechner First Amendment Project, in a joint brief, echo many of these same points. They add that violent depictions receive First Amendment protection in other media such as films and video games, and argue the same protection should extend to rap music as a medium for the expression of ideas. *See* Brief for *Amici* Thomas Jefferson Center & Brechner First Amendment Project at 11.

With respect to Appellant's challenge to the sufficiency of the evidence to show he intended to publish the video to the Internet or convey it to the police, we note that Appellant raised the same issue as a distinct basis for relief in his petition for allowance of appeal, and the issue was not selected for review. As such, it is not before this Court. Therefore, any proofs along these lines are only relevant insofar as they shed light on contextual factors tending to demonstrate whether the video amounted to a true threat under the circumstances. To answer that question, we initially review the First Amendment's true-threat doctrine as it has developed.

The First Amendment prohibits Congress from abridging the freedom of speech. *See* U.S. CONST. amend. I. This prohibition applies to the States through the Fourteenth Amendment. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 102 S. Ct. 3409, 3422 (1982). The "heart" of the First Amendment "has been described as the 'ineluctable relationship between the free flow of information and a self-governing people.'" *J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist.*, 569 Pa. 638, 649, 807 A.2d 847, 854 (2002) (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1047 (2nd Cir. 1979)). Hence, First Amendment freedoms apply broadly to different types of expression, including art, poetry, film, and music.[6] Such freedoms apply equally to cultured, intellectual expressions and to crude, offensive, or tawdry ones.[7]

In light of the above, the government generally lacks the authority to restrict expression based on its message, topic, ideas, or content. *See Ashcroft v. ACLU*, 535 U.S. 564, 573, 122 S. Ct. 1700, 1707 (2002) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65, 103 S. Ct. 2875, 2879 (1983)). This means the state may not proscribe speech due to its own disagreement with the ideas expressed, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992), or because those

---

[6] *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569, 115 S. Ct. 2338, 2345 (1995); *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 109 S. Ct. 2746, 2753 (1989); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65, 101 S. Ct. 2176, 2181 (1981); *Commonwealth v. Bricker*, 542 Pa. 234, 241, 666 A.2d 257, 261 (1995).

[7] *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 796 n.4, 131 S. Ct. 2729, 2737 n.4 (2011); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56, 108 S. Ct. 876, 881-82 (1988); *Cohen v. California*, 403 U.S. 15, 26, 91 S. Ct. 1780, 1789 (1971). In holding that a conviction based on wearing a jacket with the words "F--k the draft" violated the First Amendment, *Cohen* pointed out that words are sometimes used to convey not only ideas, but depth of emotion. *See id.* at 26, 91 S. Ct. at 1788.

ideas are unpopular in society. *See Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 2545 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

Nevertheless, expressive rights are "not absolute." *Ashcroft*, 535 U.S. at 573, 122 S. Ct. at 1707. The Constitution tolerates content-based speech restrictions in certain limited areas when that speech is "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 769 (1942); *see R.A.V.*, 505 U.S. at 383, 112 S. Ct. at 2543 (noting that freedom of speech "does not include a freedom to disregard these traditional limitations"). Accordingly, *J.S.* recognized that "certain types of speech can be regulated if they are likely to inflict unacceptable harm," and listed several examples. *J.S.*, 569 Pa. at 650, 807 A.2d at 854 (citing *Chaplinsky*, 315 U.S. at 572, 62 S. Ct. at 769 (fighting words); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827 (1969) (*per curiam*) (incitement to imminent lawlessness); *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607 (1973) (obscenity); *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964) (defamation)); *see also United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 2544 (2012) (mentioning these categories as well child pornography, fraud, and other "speech integral to criminal conduct" (citations omitted)).

Of particular relevance to this case, speech which threatens unlawful violence can subject the speaker to criminal sanction. *See Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 1401 (1969) (*per curiam*) (explaining that the government may criminalize "true threat[s]" but not mere political hyperbole (internal quotation marks omitted)). Threats of violence fall outside the First Amendment's protective scope

because of the need to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V.*, 505 U.S. at 388, 112 S. Ct. at 2546.

The true-threat doctrine has its genesis in the *Watts* case. In that matter, Watts was attending a discussion group in Washington, D.C., during the Vietnam War when the military draft was in effect. After someone suggested young people become more educated before expressing their views, Watts responded:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

*Watts*, 394 U.S. at 706, 89 S. Ct. at 1401 (internal quotation marks and citation omitted).

Watts was convicted under a federal statute making it a crime to threaten the President. *See* 18 U.S.C. §871(a). The Supreme Court found the statute facially valid in light of the "overwhelming" interest in protecting the President's safety and allowing him to perform his duties unhampered by threats of violence. *Watts*, 394 U.S. at 707, 89 S. Ct. at 1401. Nevertheless, the Court concluded that Watts' conviction could only be upheld if his words conveyed an actual threat as opposed to political hyperbole. Considering the full context of the statement – it was uttered during a political debate which often involves inexact and abusive language, the alleged threat was conditioned on an event Watts vowed would never occur (his induction into the military), and the audience reacted by laughing – the Court determined that the statement could only reasonably be interpreted as an expression of political dissent and not a true threat. Thus, the Court overturned Watts' conviction. *See Watts*, 394 U.S. at 708, 89 S. Ct. at 1401-02.

In the years following *Watts*, a number of courts assessed whether a speaker's words constituted a true threat by looking to similar contextual circumstances. *See generally J.S.*, 569 Pa. at 654-56, 807 A.2d at 857-58 (discussing cases). These courts used an objective standard rather than evaluating the speaker's subjective intent. *See id.* at 655 n.8, 807 A.2d at 858 n.8 (citing cases). Various objective tests emerged, some focusing on how a reasonable listener would construe the speech in context, and others asking what kind of reaction a reasonable speaker would foresee on the part of the actual listener or a hypothetical reasonable listener. *See State v. Perkins*, 626 N.W.2d 762, 767-70 & nn.10-18 (Wis. 2001) (discussing several of these variations). *But cf. United States v. Alaboud*, 347 F.3d 1293, 1297 n.3 (11th Cir. 2003) (indicating that these formulations, in operation, are the same as they ultimately depend on how a reasonable listener would understand the communication), *overruled on other grounds by United States v. Martinez*, 800 F.3d 1293, 1295 (11th Cir. 2015) (*per curiam*).

The Supreme Court next addressed the true-threat concept in *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536 (2003). In that matter, the Court reviewed a Virginia statute which made it unlawful to burn a cross in public or on another's property with the intent to intimidate any person or group. Importantly, the enactment also included a statutory presumption making the burning of a cross "prima facie evidence of an intent to intimidate a person or group of persons." *Id.* at 348, 123 S. Ct. at 1541-42 (quoting VA. CODE §18.2-423).

A majority of Justices found the statutory presumption constitutionally problematic. In a portion of her lead opinion representing the views of four jurists,[8] Justice O'Connor explained that such a presumption could allow the state to criminalize

---

[8] Some sections of the lead opinion reflected the views of four Justices, while others were also joined by Justice Scalia, thus attaining majority status.

constitutionally-protected cross burnings such as those intended only as statements of ideology or group solidarity, those intended to anger but not intimidate, or those undertaken in a dramatic performance. *See id.* at 365-66, 123 S. Ct. at 1551 (plurality in relevant part). In a non-joining responsive opinion, Justice Souter, joined by two other Justices, articulated similar views, stating, "the symbolic act of burning a cross, without more, is consistent with both intent to intimidate and intent to make an ideological statement free of any aim to threaten." *Id.* at 385, 123 S. Ct. at 1561 (Souter, J., concurring and dissenting). His concern was that, in close cases with conflicting evidence as to the cross-burner's intent, the statutory presumption might sway a factfinder to convict – which in turn could risk converting the statute into a means of suppressing ideas. *See id.* at 386, 123 S. Ct. at 1561-62.

In the post-*Black* timeframe, courts have disagreed over whether the speaker's subjective intent to intimidate is relevant in a true-threat analysis. Some have continued to use an objective, reasonable-person standard. These courts interpret *Black*'s intent requirement as applying to the act of transmitting the communication. *See United States v. Clemens*, 738 F.3d 1, 11 (1st Cir. 2013) (citing cases). In their view, an objective standard remains appropriate for judging whether the speech, taken in its full context, embodies a serious expression of an intent to commit unlawful violence. They reason from the premise that the First Amendment traditionally lifts its protections based on the injury inflicted rather than the speaker's guilty mind. *See, e.g., United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012), *abrogation on other grounds recognized by United States v. Houston*, 683 Fed. Appx. 434, 438 (6th Cir. 2017); *United States v. White*, 670 F.3d 498, 508-09 (4th Cir. 2012), *abrogated on other grounds by United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016).

Other courts have read *Black* as implying that the First Amendment only allows the government to penalize threatening speech uttered with the highest level of scienter, namely, a specific intent to intimidate or terrorize. *See United States v. Cassel*, 408 F.3d 622, 632-33 (9th Cir. 2005); *but cf. Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008) (observing that the Ninth Circuit has not consistently followed a subjective-intent standard). Still others have charted something of a middle course, suggesting that "an entirely objective definition [of a true threat] is no longer tenable" after *Black*, while reserving judgment on whether the standard should be subjective only, or a subjective-objective combination pursuant to which a statement "must objectively *be* a threat and subjectively be *intended* as such." *United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (emphasis in original).

As we read *Black*, an objective, reasonable-listener standard such as that used in *J.S.* is no longer viable for purposes of a criminal prosecution pursuant to a general anti-threat enactment.[9] It seems to us that the seven members of the *Black* Court whose views were represented by Justice O'Connor's plurality opinion and Justice

---

[9] We refer to general anti-threat statutes because the government may have more leeway with regard to anti-threat laws aimed at protecting a specific class of individuals or avoiding disastrous consequences. *See, e.g.*, *CISPES v. FBI*, 770 F.2d 468 (5th Cir. 1985) (dealing with a statute making it a crime to threaten or intimidate foreign officials or internationally protected persons); *United States v. Hicks*, 980 F.2d 963 (5th Cir. 1992) (applying a law which criminalizes the threatening or intimidation of airline crews in such a way as to interfere with the performance of their duties).

The terroristic threats law under which Appellant was convicted qualifies as a general anti-threat statute. *See supra* note 1. By contrast, the witness intimidation statute is aimed at deterring not only threats, but the public harm occasioned by such threats, namely, the obstruction of criminal justice. Still, the parties' advocacy is directed to true-threat jurisprudence in a more general sense. As will be seen below, moreover, Appellant's convictions under both provisions survive First Amendment restrictions applicable to general anti-threat legislation.

Souter's responsive opinion believed the First Amendment necessitates an inquiry into the speaker's mental state. *Cf. Elonis v. United States*, ___ U.S. ___, 135 S. Ct. 2001 (2015) (holding that, under longstanding common-law principles, a federal anti-threat statute which does not contain an express scienter requirement implicitly requires proof of a *mens rea* level above negligence). Our conclusion in this regard stems from the fact that these Justices viewed the Virginia statute's presumption as raising substantial First Amendment difficulties. In criticizing that aspect of the law, their focus seems to have been on values and concerns associated with the First Amendment: the social undesirability of suppressing ideas, punishing points of view, or criminalizing statements of solidarity or ideology. Construing the Court's discussion of the speaker's intent as pertaining solely to the act of transmitting the speech appears difficult to harmonize with the assertion that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear* of bodily harm or death." *Black*, 538 U.S. at 360, 123 S. Ct. at 1548 (majority in relevant part) (emphasis added); *see also id.* at 363, 123 S. Ct. at 1549 (majority in relevant part) ("The First Amendment permits Virginia to outlaw cross burnings *done with the intent to intimidate* because burning a cross is a particularly virulent form of intimidation." (emphasis added)).[10]

_____

[10] With that said, we are not fully aligned with the Ninth Circuit's view that, under *Black*, a specific intent to threaten is "the *sine qua non* of a constitutionally punishable threat." *Cassel*, 408 F.3d at 631. The *Black* majority used open-ended language to describe the true-threat classification, which is understandable as there was no need in that particular case to decide whether First Amendment protections fall away *only* when there is a specific intent to intimidate. Thus, it remains an open question whether a statute which criminalizes threatening statements spoken with a lower scienter threshold, such as knowledge or reckless disregard of their threatening nature, can survive First Amendment scrutiny. *See Perez v. Florida*, ___ U.S. ___, ___, 137 S. Ct. 853, 854-55 (2017) (Sotomayor, J., concurring in denial of *certiorari*) (expressing that, after *Black*, the distinction between protected speech and punishable threats turns in (continued…)

To summarize, then, the two facets of *Black* which are most relevant to this dispute are as follows. First, the Constitution allows states to criminalize threatening speech which is specifically intended to terrorize or intimidate.[11] Second, in evaluating whether the speaker acted with an intent to terrorize or intimidate, evidentiary weight should be given to contextual circumstances such as those referenced in *Watts*. With these principles in mind, we apply our appellate standard of review as articulated above in light of the evidence adduced at trial and the common pleas court's factual findings.

As recounted above, the trial court convicted Appellant of two distinct crimes, terroristic threats and witness intimidation. As to both offenses, the court found beyond a reasonable doubt that Appellant acted with a subjective intent to terrorize or intimidate the officers in question. For purposes of terroristic threats, this follows from fact that such intent is an element of the offense. *See* 18 Pa.C.S. §§2706(a)(1). With regard to

---

(…continued)

part "on the speaker's intent," and exhorting the Court, in an appropriate case, to "decide precisely what level of intent suffices under the First Amendment"); *Elonis*, ___ U.S. at ___, 135 S. Ct. at 2026 (Thomas, J., dissenting) ("Neither [*Watts* nor *Black*] addresses whether the First Amendment requires a particular mental state for threat prosecutions."). Because Appellant was found to have acted intentionally with regard to both terroristic threats and witness intimidation, we need not presently resolve that question. We only note here that such statutes are not uncommon. *See, e.g.*, 18 Pa.C.S. §4952(a) (penalizing threats communicated with a "knowing" *mens rea*); *State v. Pukahi*, 776 P.2d 392, 393 (Haw. 1989) (indicating that, pursuant to state law, threatening speech is a crime when coupled with "reckless disregard of the risk of terrorizing"); *cf.* 18 Pa.C.S. §2706(a)(3) (prohibiting the communication of a threat to cause serious public inconvenience or terror "with reckless disregard of the risk of causing such terror or inconvenience").

[11] While an intent to intimidate or terrorize is distinct from an intent to carry out the threat, there is little indication in *Black* that, for a statement to attain true-threat status, the speaker must have intended to follow through on his threat. As noted, the fear of violence and the disruption such fear engenders are independent harms that anti-threat statutes seek to curtail. *See R.A.V.*, 505 U.S. at 388, 112 S. Ct. at 2546.

witness intimidation, the trial court placed on the record its particularized finding that Appellant acted with such intent. Under *Black*, these findings, if supported by competent evidence, are sufficient to place the rap song within the true-threat category. Thus, we consider the content and full context of what the song communicated.

We first review the content of the speech itself, beginning with the lyrics. They do not merely address grievances about police-community relations or generalized animosity toward the police. They do not include political, social, or academic commentary, nor are they facially satirical or ironic. Rather, they primarily portray violence *toward* the police, ostensibly due to the officers' interference with Appellants' activities. In this regard, they include unambiguous threats with statements such as, "Let's kill these cops cuz they don't do us no good" and "that whole department can get it." They reference "soldiers" that will "f--k over" the police, a plan to make false emergency calls and "bust[] heavy metal" toward the officers who respond to the call, and a desire to "jam this rusty knife all in [the officer's] guts."[12]

The lyrics also appear to express a consciousness that they step beyond the realm of fantasy or fiction in that they indicate Appellant was advised by one of his elders "not to put this on CD," but he is ignoring such advice so that the whole city will "believe" him. Similarly, Appellant vows that the activities described will be "real" once a certain named individual returns from military service.

These aspects of the song tend to detract from any claim that Appellant's words were only meant to be understood as an artistic expression of frustration. Most notably

---

[12] The second verse, sung by Beasley, includes lyrics which portray the killing of police officers in an equally threatening manner. Due to the trial court's finding that the song was a collaborative effort on the part of Appellant and Beasley, and in light of the unifying theme of all three verses as well as the chorus, such words can reasonably be viewed as a joint expression of both defendants. Out of an abundance of caution, however, we will not consider the second verse in our true-threat analysis.

along these lines, Appellant mentions Detective Zeltner and Officer Kosko by name, stating that the lyrics are "for" them. Appellant proceeds to describe in graphic terms how he intends to kill those officers. In this way, the lyrics are both threatening and highly personalized to the victims.

Such personalization occurs, not only through use the officers' names, but via other facets of the lyrics. They reference Appellant's purported knowledge of when the officers' shifts end and, in light of such knowledge, that Appellant will "f--k up where you sleep."

Additionally, the threats are directed at the officers based on the complaint, tied to interactions which had recently taken place between them and Appellant, that the police had been "knockin' my riches" – as Officer Kosko did by confiscating cash from Appellant upon his arrest – and vowing that the police "won't keep" doing so. *See* N.T., Nov. 13, 2013, at 210 (reflecting Officer Spangler's testimony that "knocking riches" is a slang phrase which refers to a police officer confiscating cash during an arrest where drugs are involved). Along these same lines, they refer to the police having "tak[en] money away from" Beasley "and all my s--t away from me." Such harm to Appellant's personal wealth, and the officers' interference with his drug-selling activities, together with the upcoming criminal proceedings at which the latter were scheduled to testify against Appellant, are stated in the lyrics to provide the primary motivation for Appellant's desire to exact violent retribution.

Finally, the lyrics suggest a knowledge of the identity of the officers' confidential informants and a plan to murder at least one such informant with a Glock.

The words themselves are not the only component of Appellant's expressive conduct which tends to make the song threatening. The sound track includes bull

horns, police sirens, and machine-gun fire ringing out over the words, "bustin' heavy metal."[13]

Pursuant to *Watts* and *J.S.*, we also consider contextual factors in assessing whether the speech conveys a serious expression of an intent to inflict harm. *Accord In re S.W.*, 45 A.3d 151, 157 (D.C. 2012). These factors include such items as whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how the listeners reacted to the speech. *See J.S.*, 569 Pa. at 656, 807 A.2d at 858.

Here, unlike in *Watts*, the threats are mostly unconditional. As noted, moreover, Officer Spangler immediately notified other police personnel, reflecting that he did not see it as mere satire or social commentary. The victims developed substantial concern for their safety and took measures – such as separating from the police force earlier than planned, moving to a new residence, or obtaining a security detail – to avoid becoming victims of violence. Also, the police department allocated additional resources to Zone 5 to prevent the threatened violence from occurring.

Separately, although the song was not communicated directly to the police and a third party uploaded it to YouTube, this factor does not negate an intent on Appellant's part that the song be heard by the officers. As the Superior Court observed, Appellant's and Beasley's prior course of conduct suggested they either intended for the song to be published or knew publication was inevitable. Further, after the song was uploaded to YouTube, it was linked to the "Beaz Mooga" Facebook page. Unlike in *J.S.*, there was

---

[13] Although the photos of Appellant and Beasley appearing to motion as if firing weapons may have added to the menacing nature of the communication, it was unclear whether Appellant was involved with that portion of the video, and at one point the court specifically referred to the "musical track" as containing the threats. N.T., Nov. 13, 2013, at 141.

no suggestion the song was merely in jest or that it should not be conveyed to the police. *See id.* at 658, 807 A.2d at 859 (highlighting that the student's offensive web site included a disclaimer page indicating that it was not intended to be seen by school employees). For its part, the trial court, which heard all the testimony first-hand, found that Appellant intended for it eventually to reach the officers. *See* N.T., Nov. 21, 2013, at 463.

As for whether the officers had reason to believe Appellant might engage in violence, it is relevant that they were aware a loaded firearm had been found near Appellant's feet in the automobile he was driving. Although Appellant was ultimately acquitted of the firearm charges stemming from the weapon's presence in the car, the video was posted to the Internet and seen by the officers well before the trial occurred.

We acknowledge that, as Appellant and his *amici* argue, rap music often contains violent imagery that is not necessarily meant to represent an intention on the singer's part to carry through with the actions described. This follows from the fact that music is a form of art and "[a]rtists frequently adopt mythical or real-life characters as alter egos or fictional personas." Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 COLUM. J.L. & ARTS 1, 23 (2007) (footnote omitted). We do not overlook the unique history and social environment from which rap arose, the fact that rap artists (like many other artists) may adopt a stage persona that is distinct from who they are as an individual, or the fact that musical works of various types may include violent references, fictitious or fanciful descriptions of criminal conduct, boasting, exaggeration, and expressions of hatred, bitterness, or a desire for revenge.[14] In many

---

[14] Nor do we discount that First Amendment freedoms need "breathing space to survive," as *amici* forcefully argue. *See, e.g.*, Brief for *Amicus* ACLU of Pa. at 16 (quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 338 (1963)).

instances, lyrics along such lines cannot reasonably be understood as a sincere expression of the singer's intent to engage in real-world violence.

With that said, the rap song here is of a different nature and quality, as detailed above. Even if we accept, *arguendo,* that most "gangsta rap" works solely constitute "art, poetry, and fantasy," Brief for *Amicus* Defender Ass'n of Phila. at 15, the content and surrounding circumstances of the song in issue do not demonstrate an adherence to the distinction between singer and stage persona sufficient to ameliorate its threatening nature. Although some attributes of the song arguably reflect the difference – such as the use of Appellant's stage name "Mayhem Mal," references to an apparently fanciful "ghetto superstar committee," and sophisticated production effects – these features are contradicted by the many factors already discussed tending to suggest the singers are in earnest. Most saliently, the calling out by name of two officers involved in Appellant's criminal cases who were scheduled to testify against him, and the clear expression repeated in various ways that these officers are being selectively targeted in response to prior interactions with Appellant, stand in conflict with the contention that the song was meant to be understood as fiction.

All of this leads us to conclude that the trial court's finding as to Appellant's intent was supported by competent evidence.

More generally, if this Court were to rule that Appellant's decision to use a stage persona and couch his threatening speech as "gangsta rap" categorically prevented the song from being construed as an expression of a genuine intent to inflict harm, we would in effect be interpreting the Constitution to provide blanket protection for threats, however severe, so long as they are expressed within that musical style. We are not aware of any First Amendment doctrine that insulates an entire genre of communication from a legislative determination that certain types of harms should be regulated in the

interest of public safety, health, and welfare. *See Jeffries*, 692 F.3d at 482 ("Jeffries cannot insulate his menacing speech from proscription by conveying it in a music video[.]"); *see also State v. Jones*, 64 S.W.3d 728, 736-37 (Ark. 2002) (holding that a rap song constituted a true threat). Pennsylvania's legislative body has made such a policy judgment by enacting statutes which prohibit the making of terroristic threats and the intimidation of witnesses, and for the reasons given Appellant cannot prevail on his claim that his convictions under those provisions offend the First Amendment.

The order of the Superior Court is affirmed.


Justices Baer, Todd, Dougherty and Mundy join the opinion.

Justice Wecht files a concurring and dissenting opinion in which Justice Donohue joins.