J-S16018-22

2022 PA Super 195

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JOHN WILLIAM COLLINS | : | |
| | : | |
| Appellant | : | No. 1419 MDA 2021 |

Appeal from the Judgment of Sentence Entered September 9, 2021,
in the Court of Common Pleas of Huntingdon County,
Criminal Division at No(s):  CP-31-CR-0000227-2020.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

DISSENTING OPINION BY KUNSELMAN, J.:   **FILED: NOVEMBER 18, 2022**

I agree with the Majority that there was sufficient evidence to support Mr. Collins' conviction for harassment under 18 Pa.C.S.A. § 2709(a)(3) and join that section of the Majority Opinion in full.  However, because the First Amendment to the Constitution of the United States bars Pennsylvania from prosecuting Mr. Collins' speech under the facts of this case, I must respectfully dissent.

In his as-applied claim of unconstitutionality, Mr. Collins argues that subject to well-defined exceptions, all speech in America comes under the protections of the First Amendment, even when rude, vulgar, or offensive.  He observes that the Supreme Court of the United States recognized specific categories of speech that a state may punish including obscenity, defamation, and fighting words.  **See C.W. v. Swillinger**, 676 A.2d 687, 689 (Pa. Super.

_____

[*] Retired Senior Judge assigned to the Superior Court.

1996) (citing **R.A.V. v. St. Paul**, 505 U.S. 377 (1992)); **see also United States v. Alvarez**, 576 U.S. 709, 717-18 (2012) (opinion of Kennedy, J.) (listing "historic and traditional categories" of unprotected speech); **United States v. Stevens**, 559 U.S. 460, 468-69 (2010). In his view, the poster and letters regarding Mr. Hoffman are none of those types of speech. I agree.

My learned colleagues in the Majority do not identify any recognized exception to the First Amendment that would apply to Mr. Collins' speech.[1] This deficiency should end our analysis, and Mr. Collins' conviction should be overturned. Nevertheless, the Majority denies his speech constitutional protection by crafting a new exception to the First Amendment, the "shame and provoke" exception. **Id.**

If this novel exception gains acceptance, it will swallow the whole purpose of the rule – *i.e.*, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[2] If the Majority's novel, amorphous "shame or provoke" exception is added to the corpus of constitutional law, it will overshadow and impede an important purpose of this rule – to facilitate the free flow of ideas in society. **See Virginia St. Bd. of**

---

[1] The Majority's reliance on **Commonwealth v. Hendrickson**, 724 A.2d 315, 318 (Pa. 1999) to support Mr. Collins' harassment conviction is misplaced. See Majority Opinion at 14. That case is distinguishable because it dealt with punishing the harassing conduct and not the speech itself. Here, by contrast, Mr. Collins was convicted not for his actions but for the content of his speech.

[2] The Due Process Clause of the Fourteenth Amendment incorporated the freedom of speech against the States. **See Gitlow v. New York**, 268 U.S. 652 (1925).

*Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). The Framers did not draft the First Amendment to shield blessings or compliments from censorship. Kind and complimentary speech does not need constitutional protection. Speech that criticizes, however, does. The First Amendment deliberately protects speech that some might find offensive. Thus, speech that might shame or provoke people falls under this protection. Unlike the Majority, I would enforce only the limited exceptions to free speech that the Supreme Court of the United States has articulated over the centuries, and not create a new one.

The Majority's reliance on *Snyder v. Phelps*, 562 U.S. 443 (2011), to support its conclusion is bewildering. My colleagues cite this case for the general premise that "Not all speech is of equal First Amendment importance, [] and where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Id*. at 452. In *Snyder*, the Supreme Court of the United States noted, "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain." *Id*. at 460-61. Even still, the court recognized that it could not "react to that pain by punishing the speaker." *Id.* at 461. The court explained, "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.*

The speech at issue in *Synder* involved a church picketing the funeral for a deceased military member. The picket signs reflected the church's view

that "the United States is overly tolerant of sin and that God kills American soldiers as punishment." *Id*. at 447. The family of the deceased soldier sued for intentional infliction of emotional distress and other torts. The High Court, however, determined that under the First Amendment tort liability could not be imposed on the church for what it said.

Here, the speech at issue was far less shameful and provocative than in *Snyder*, and the penalty was more stringent, as it involved criminal rather than civil consequences. While speech here is not of public concern or regarding public figures and thus may arguably be of lesser importance under the First Amendment, that does not mean that the speech forfeits all protections. For the state to criminalize private speech, the speech must fall neatly in one of the exceptions recognized by the Supreme Court of the United States. *See Stevens*, 559 U.S. at 471-72.

In the landmark case of *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), the High Court identified certain types of speech that the First Amendment allows the States to prosecute. "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Id.* at 571-72. Sanctionable speech includes "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572.

Such "utterances are no essential part of any exposition of ideas and are of such slight social value . . . that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Id.* (quoting **Cantwell v. Connecticut**, 310 U.S. 296 (1940)).

In its brief, the Commonwealth latches on to that quotation from **Cantwell**. It uses the statement to suggest that Mr. Collins' poster and letters are proper subjects for prosecution. **See** Commonwealth's Brief at 3 n.4.

However, the Commonwealth has taken the excerpt out of context. In the sentence prior to that statement, the **Cantwell** Court offered a proviso: "the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks **directed to the person of the hearer.**" **Cantwell**, 310 U.S. at 309 (emphasis added). In other words, the epitaphs or personal abuses that the First Amendment allows States to prosecute are those likely to incite the hearer to assault someone else or to riot — *i.e.*, to breach the peace. **See id.** Otherwise, the State has no compelling interest to justify curtailing the speaker's freedom of speech.

In this case, both parties agree that Mr. Collins did not distribute the poster or letters to the person they ridiculed (Mr. Hoffman) or anyone else who would have likely reacted in a violent manner to the content (such as Mr.

Hoffman's family or close friends).[3]  As such, the posters and letters do not constitute "abusive remarks directed to the person of the hearer." **Cantwell**, **supra**.  Instead, they were directed to disinterested third parties, and the record does not indicate that any of those people were likely to breach the Commonwealth's peace upon reading Mr. Collins' poster or letters.

In fact, every person who read them reacted peaceably.  The mail carrier removed the poster from the mailboxes, Ms. Snyder took the poster down and threw it in the trash, and Mrs. Heester turned her letter over to the postal clerk.  Thus, everyone's reactions to them were calm, rational, and peaceful.

No one took Mr. Collins' bizarre, immature rant in the poster or letters seriously.  His communications did not stir any of his readers to anger, much less hostility.  This incident created no possibility that the peace would be breached by violence against Mr. Collins or anyone else.

"When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." **Cantwell**, 310 U.S. at 308.  Here, no such threats to public safety even potentially manifested themselves.  Therefore, I conclude that neither the poster nor the letters contained any "fighting words" over which the Commonwealth could assert a compelling governmental interest in curtailing.

_____

[3] In this way, the constitutional analysis differs from the sufficiency analysis cogently articulated by the Majority.  Majority Opinion at 7-10.

Additionally, the words did not amount to a "true threat" against Mr. Hoffman that would justify criminal prosecution. As the Supreme Court of Pennsylvania observed, the Constitution of the United States allows states to criminalize threatening speech that is specifically intended to terrorize or intimidate. *Commonwealth v. Knox*, 190 A.3d 1146, 1158 (Pa. 2018) (citing *Virginia v. Black*, 635 U.S. 343 (2003)). In evaluating whether the speaker acted with an intent to terrorize or intimidate, evidentiary weight should be given to contextual circumstances such as those referenced in *Watts v. United States*, 394 U.S. 705 (1969) (*per curiam*) (explaining that the government may criminalize "true threat[s]" but not mere political hyperbole).[4]

Our Supreme Court in *Knox* applied this framework to assess whether song lyrics threatening two police officers were "true threats" such that the

_____

[4] Watts was convicted under a federal statute making it a crime to threaten the President. *See* 18 U.S.C. § 871(a). The Supreme Court found the statute facially valid considering the "overwhelming" interest in protecting the President's safety and allowing him to perform his duties unhampered by threats of violence. *Watts*, 394 U.S. at 707. Nevertheless, the Court concluded that Watts' conviction could only be upheld if his words conveyed an actual threat as opposed to political hyperbole. Considering the full context of the statement – it was uttered during a political debate which often involves inexact and abusive language, the alleged threat was conditioned on an event Watts vowed would never occur (his induction into the military), and the audience reacted by laughing – the Court determined that the statement could only reasonably be interpreted as an expression of political dissent and not a true threat. Thus, the Court overturned Watts' conviction. *See Watts*, 394 U.S. at 708.

First Amendment did not prevent prosecuting Knox for his speech. The analysis is instructive.

Our Supreme Court examined the lyrics and concluded that they primarily portrayed violence toward the police, ostensibly due to the officers' interference with Knox's activities. The lyrics included unambiguous threats; they referenced "soldiers" that will "f--k over" the police, a plan to make false emergency calls and "bust[ ] heavy metal" toward the officers who respond to the call, and a desire to "jam this rusty knife all in [the officer's] guts." *Id*. at 614.

The lyrics also appeared to express a consciousness that they step beyond the realm of fantasy or fiction because Knox wanted the whole city to "believe" him. Similarly, he vowed that the activities described would be "real" once a certain named individual returned from military service.

These aspects of the song tended to detract from any claim that Knox's words were only meant to be understood as an artistic expression of frustration. Most notably along these lines, Knox mentioned the officers by name, stating that the lyrics are "for" them, and then proceeded to describe in graphic terms how he intended to kill those officers. In this way, the lyrics were both threatening and highly personalized to the victims.

The lyrics also referenced Knox's purported knowledge of when the officers' shifts end and, in light of such knowledge, that Knox would "f--k up where you sleep."

Additionally, the threats were directed at the officers based on the complaint, tied to interactions which had recently taken place between them and Knox, that the police had been "knockin' my riches" – as one officer did by confiscating cash from Knox upon his arrest – and vowing that the police "won't keep" doing so (reflecting the officer's testimony that "knocking riches" is a slang phrase which refers to a police officer confiscating cash during an arrest where drugs are involved). Along these same lines, they refered to the police having "tak[en] money away from" Beasley "and all my s--t away from me." Such harm to Appellant's personal wealth, and the officers' interference with his drug-selling activities, together with the upcoming criminal proceedings at which the latter were scheduled to testify against Appellant, were stated in the lyrics to provide the primary motivation for Appellant's desire to exact violent retribution.

Finally, the lyrics suggested a knowledge of the identity of the officers' confidential informants and a plan to murder at least one such informant with a Glock. The words themselves were not the only component of Knox's expressive conduct which tends to make the song threatening. The soundtrack included bull horns, police sirens, and machine-gun fire ringing out over the words, "bustin' heavy metal." Examining the words in this context, our High Court found the lyrics amounted to a true threat and upheld Knox's criminal convictions for terroristic threats and witness intimidation.

Here, by contrast, the language of Mr. Collins' poster and letters did not truly threaten Mr. Hoffman. Instead, they were mere hyperbole. Mr. Collins

did not express a desire to harm Mr. Hoffman, nor did he communicate the message on the documents directly to Mr. Hoffman. Therefore, Mr. Collins' speech was not a "true threat" that the government could prosecute.

Having determined that Mr. Collins' poster and letters did not amount to fighting words or true threats, I also note that they could not be classifiable as "the lewd and obscene, the profane, [or] the libelous." **Chaplinsky**, 315 U.S. at 572. Nothing in the poster or letters was sexually suggestive, and there was no profanity or obscenity. Additionally, no reasonable reader could interpret them as making factual allegations concerning Mr. Hoffman's ancestry as being half goat and half pig. Thus, they are incapable of being deemed libelous publications, because they have no defamatory meaning. **See, e.g.**, **Burns v. Cooper**, 244 A.3d 1231, 1236 (Pa. Super. 2020), *reargument denied* (Oct. 14, 2020), *appeal denied*, 252 A.3d 235 (Pa. 2021) (explaining that "statements which are merely annoying or embarrassing, no more than rhetorical hyperbole, or a vigorous epithet are not defamatory").

Any reasonable reader would interpret them for what they are — childish (even absurd) vitriol and the opinions of someone who personally dislikes Mr. Hoffman. In fact, that is exactly how every reader dismissed them, until the Commonwealth decided to prosecute.

The reliance of the Commonwealth and the trial court upon this Court's plurality decision in **Commonwealth v. Duncan**, 363 A.2d 803 (Pa. Super. 1976) (*en banc*), does not persuade me otherwise. There, of the seven judges

on the panel, three upheld the constitutionality of the harassment statute in the face of a First Amendment challenge, while one judge concurred in result, and three dissented.

The facts of **Duncan** are distinguishable from this case. There, a man repeatedly asked a college student (whom he did not know) to allow him to perform oral sex on her while she attempted to study in the lounge of her residence hall. The woman continuously rejected his advances and eventually reported him to the resident assistant. Campus police arrested him for harassment. In affirming the conviction, this Court held that the man's "lewd . . . suggestions do not . . . have the protection of the First Amendment." **Id.** at 806. Thus, unlike the speech at issue in this appeal, the comments in **Duncan** fell under the first category of unprotected speech, "lewd and obscene" words. **Chaplinsky**, 315 U.S. at 275. The Commonwealth's attempt to support its conviction of Mr. Collins based upon **Duncan** fails.

That said, I recognize that the poster and letters Mr. Collins printed, authored, and distributed were crass and likely offended Mr. Hoffman once he learned of them. However, to any rational reader, Mr. Collins' speech says more about himself than Mr. Hoffman.

Additionally, I understand why public servants like Ms. Snyder would not desire such rubbish on her post office's bulletin board or in her customers' mailboxes. Ms. Snyder's remedy was to remove the poster, as she did. To be clear, I do not support or condone Mr. Collins' immature name-calling, but

the First Amendment protects his right to engage in such speech without the risk of criminal prosecution.

We must remember that the First Amendment does not exist to protect kind and desirable speech. The Framers adopted it to shield words (such as Mr. Collins') that most citizens do not want to hear, with limited exceptions for speech that is obscene, that falsely damages one's reputation, or that will likely cause an imminent breach of the peace. Here, none of these exceptions applies. **See** Majority Opinion at 16. Therefore, although the trial court correctly interpreted Pennsylvania's harassment statute, the First Amendment preempts that state law[5] and bars Mr. Collins' prosecution and conviction on these facts.[6]

I would vacate the judgment of sentence, reverse the order denying post-sentence judgment of acquittal, and discharge Mr. Collins.

---

[5] **See** U.S. Const. art. VI (dictating, "This Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the . . . Laws of any State to the Contrary notwithstanding.") Hence, "the Constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void; and that **courts**, as well as other departments, are bound by that instrument [*i.e.*, the constitution]." **Marbury v. Madison**, 5 U.S. 137, 180, (1803) (emphasis in original).

[6] I need not—and, therefore, do not—address Mr. Collins' third appellate issue regarding the discretionary aspects of his sentence. Given my disposition of his constitutional issue, his third issue should be dismissed as moot.