J-A04018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| TYLER BOLLINGER, | : | |
| | : | |
| Appellant | : | No. 611 EDA 2018 |

Appeal from the Judgment of Sentence January 4, 2018
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004371-2014
CP-51-CR-0004374-2014
CP-51-CR-0004377-2014

BEFORE:  PANELLA, P.J., STRASSBURGER, J.* and COLINS, J.*

MEMORANDUM BY STRASSBURGER, J.:          **FILED DECEMBER 11, 2020**

Tyler Bollinger (Appellant) appeals from the judgments of sentence entered following revocation of his terms of probation.[1]  We affirm.

The underlying cases stem from an incident where Appellant and four co-defendants attacked a group of high school students, seriously injuring three of them.  Appellant entered into negotiated guilty pleas on the three

---

[1] We note that Appellant should have filed a separate notice of appeal from each of the three separate trial court docket numbers.  **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that "in future cases [Pa.R.A.P.] 341(a) will, in accordance with its Official Note, require that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed. The failure to do so will result in quashal of the appeal").  However, our Supreme Court's mandate applies prospectively to appeals filed after the date of the **Walker** decision, *i.e.*, June 1, 2018.  Because the instant appeal was filed on February 1, 2018, the **Walker** holding does not apply and we decline to quash the appeal.

* Retired Senior Judge assigned to the Superior Court.

dockets, which resulted in his pleading guilty to three counts of aggravated assault, one count of conspiracy, and one count of possession of an instrument of crime (PIC).

We glean the following from the recitation of facts to which Appellant pleaded guilty at his guilty plea hearing. *See* N.T., 10/10/2017, at 15-17. On March 21, 2014, at about 10 p.m., Appellant and co-defendants Hellena Andro, David Cramp, John Farrell, and Ryan Palen encountered a group of high school students, including Thomas Bayer, Joseph Galasso, and James Galasso (collectively, the Victims). Appellant and the co-defendants initiated a physical fight with the Victims by throwing glass beer bottles at them. The Victims, who were unarmed, responded by engaging in a fistfight, punching Appellant and co-defendants. In the end, the Victims were stabbed multiple times and suffered critical injuries that required hospitalization. Bayer suffered five stab wounds, Joseph suffered three, and James suffered eight. Appellant and the co-defendants ran from the scene to the residence of Appellant's father, where Appellant hid two knives that were used in the assault. The knives were recovered pursuant to a search warrant executed the following day. Appellant was not identified by the Commonwealth as one of the individuals who had stabbed the Victims.

Based on the foregoing, Appellant and the co-defendants were charged with aggravated assault and related offenses and listed for a consolidated jury trial. Prior to trial, co-defendants Andro, Cramp, and Palen pleaded

guilty. Thereafter, the Commonwealth agreed to sever the trials of Appellant and Farrell. Farrell's trial, which was held first, resulted in a mistrial due to a hung jury. The Commonwealth then moved to consolidate Appellant's and Farrell's cases for a jury trial, which the trial court granted over Appellant's objection.

After several continuances, the consolidated jury trial was scheduled for October 10, 2017. Before trial started on that date, Appellant entered into a negotiated guilty plea to the following: at docket 4371-2014, aggravated assault (victim Joseph Galasso), conspiracy-aggravated assault, and PIC; at docket 4374-2014, aggravated assault (victim James Galasso); and at docket 4377-2014, aggravated assault (victim Bayer).[2] After Appellant's guilty plea colloquy, the court heard argument from counsel for the parties, testimony from Appellant's grandmother confirming Appellant would live with her if he was sentenced to a term of probation, and Appellant's allocution. The court then accepted the parties' negotiated agreement and imposed the negotiated aggregate term of 1½ to 3 years of incarceration followed by 10 years of probation on the three dockets.[3]

---

[2] The remaining charges were *nolle prossed*.

[3] The court imposed concurrent terms of 1½ to 3 years of incarceration followed by 10 years of probation for each of the aggravated assault convictions and the conspiracy conviction, and 1½ to 3 years of incarceration for the PIC conviction.

Appellant received credit for time served and was immediately released on probation with the conditions that he be supervised by the anti-violence unit; seek and maintain employment; submit to random drug and alcohol screens and comply with all treatment; submit to random home and vehicle checks for drugs or weapons; perform 100 hours of community service; have no direct, indirect, social media, or third-party contact with the Victims or Commonwealth witnesses;[4] and pay restitution.

One week later, on October 17, 2017, Appellant tested positive for marijuana. In addition, Appellant's probation officer reported that Appellant had posted a video on social media (Facebook Live) where he, among other things, openly engaged in drug and alcohol use with co-defendant Andro, "rapped," voicing his frustrations, threatened Roseanna Punzo, the mother of his young child, and disparaged the judge who sentenced him. Appellant was arrested and the court issued a detainer on November 3, 2017.

A violation of probation hearing was held on November 6, 2017. At the hearing, the court viewed the Facebook video and heard testimony from Punzo; Tabitha Dolbow, the godmother of Appellant and Punzo's child; Susan Luckangelo, Appellant's grandmother; and Appellant. The following are excerpts from the transcript of statements Appellant made during the video.

_____

[4] This included co-defendant Andro because, according to the trial court, she was listed as a cooperating witness in Farrell's trial. N.T., 1/17/2018, at 22.

- "I feel like Poltergeist, looking for a throat to slice, with this lyrical machete, get ready when I approach the mic potent … smoke this pipe and if you're fucking with me better know the price if you want to gamble with your life then go roll the dice fuck it homie. Yolo right? Am I gonna make it home at night? Might not ever see your ass again.. you know I'm right[.]"

- "[I]f I could start picking off targets like the shooting range; that's why they call me TILT;[5] …if I could start hitting my mark I gotta shooters aim[.]"

- "[C]oming through excuse me; you don't want to move I'm hittin' you with a two piece; not a 1 – 2; I'm talking a 22 piece; 22 calibers going inside of you, peace[.]"

- "You only have one life to live; one life to give; to the people who deserve the most like your wife and kids; so fuck it let the dutch light and hit cause life is quick; you might not make it through the night but miss what is right in front of your eyes, you blind spiteful bitch; I just want to see my daughter I don't like this shit; this is something I got … to fight with fists cause I don't punch females but this bitch might get kicked[.]"

- "I said fuckin up my liver; … like a flicker; pass it back to my homie.. bitch hold the liquor cause I'm driving on 95 but I'm loaded and twisted … not sober for a minute[.]"

- "[C]ock, suicide by police I die when I go free; when you do your crimes never ride with a co-D[.]"

- "LISTEN – fuck the judge, jury, fuck the DA, tell em to bring your secretary we can have a three way; homie I got Jack McMahon,[6] so what can she say; and after this brief stay... packin up my briefcase and going to an island I got this … sweepstakes for petesakes I'm sick. I said … Listen listen listen[.]"

- "Let em all fucking say I'm whack cause I'm white, pass me the mic and … I'm fast in a fight, got a straight jab.. that would put any fucking body on their ass for the night; TILTs back home tell

---

[5] This appears to be Appellant's pseudonym.

[6] Jack McMahon, Esquire was Appellant's counsel.

everybody you know, a lot of these motherfuckers try to copy my flow, I gotta be the only rapper not watching the throne, throw a fucking bomb on that bitch and watch it explode; … a mess cause I'm gonna fight til the death; my fight's quicker than a viper bite striking your neck and I gotta knife in my left that slice right through your chest right through your … slice right through your vest; motherfuckers telling me I might be the best, the only reason I was stopped because … [w]ent down[]made the most of it[,] waited for an opening so I could take the game over when I'm home again strapped with a loaded pen blast[,] then I load again[. C]aught a case[,] now I'm back and I'm showing them I'm the next to make it[.] Make you wish you never hated enemy … that's invading memories … rappers get eliminated … and incinerated … still I been the greatest.. I SAID Listen listen listen – I can go forever, I'm so fucking high right now.

- "… I never stop til I'm dead, get a fuckin glock and take a few shots to your head, got bars like the meanest cell block in the fed, got bars like the back of a cop car, got hard dope and more coke than a rock store[.]"

- "I walk out that jail smelling like a pound of some loud so Fuck probation couple pounds tucked in basements. Anybody want to try they luck I'm waiting hoping praying somebody try to test my patience. Fuck around you'll be a body with no explanation."

- "Fuckin Anne Marie Coyle.[7] This bitch is fuckin nuts. You do not want this judge. Whoever gets this fuckin judge – you better go on the fuckin run or somethin."

- Referring to and looking at Andro, Appellant said "you know who that is? That's my motherfuckin Co-D!! She goes to court in 3 days for this shit."

N.T., 11/6/2017, at Court Exh. 1 (video transcript).

To contextualize Appellant's threats in the Facebook video, Punzo testified about her past relationship with Appellant.[8] She testified that while

---

[7] The Honorable Anne Marie B. Coyle presided over Appellant's guilty plea and sentencing hearing.

they were dating, Appellant was controlling as to what she wore, to whom she spoke, and where she went. N.T., 11/6/2017, at 14. After she became pregnant with Appellant's child, he became physically abusive to her. *Id.* at 14-17. Punzo described one incident where she asked Appellant to get help for his drug use, and he refused, pushed her into a wall, and threw a glass bottle at her, hitting her in the head. *Id.* at 14-15. She testified that she did not pursue a a protection from abuse (PFA) against Appellant at that time due to Appellant's minor status. *Id.* at 16. Punzo also talked about her court-ordered child visitations with Appellant while he was incarcerated. She described one visit to Appellant in prison where he screamed and yelled at her, threatened to take their daughter from her "no matter what," and balled his hands up as if to punch her. *Id.* at 19.

Next, Punzo testified about Appellant's attempts to contact her once he was released from prison in October 2017. Punzo testified that she had changed her phone number three times so Appellant could not contact her. *Id.* at 20. Despite this, Appellant used Andro's Facebook account to message and call Punzo, and Appellant messaged Punzo's then-boyfriend and others to ask for her phone number. *Id.* Within the first two days of Appellant's release from prison, Appellant told Punzo that "he would have somebody else take care of [Punzo] if he couldn't." *Id.* She interpreted this

_____

[8] On October 18, 2017, Punzo had filed a petition for temporary protection from abuse (PFA) against Appellant. The petition was granted, a temporary PFA order was entered against Appellant, and a hearing was scheduled for October 25, 2017. N.T., 11/6/2017, at 22-23.

as a threat, and sought PFA order against Appellant on October 18, 2017.[9] *Id.* at 21-23.

Punzo further testified that Appellant's Facebook video was forwarded to her through Facebook Messenger, and she was tagged in it when the video was posted on Appellant's Facebook wall. *Id.* at 25, 32. She interpreted the video as Appellant threatening her. *Id.* at 32.

Dolbow's testimony confirmed Appellant's controlling behavior toward Punzo, and Dolbow testified that she had witnessed Appellant abuse Punzo in the past, including throwing a bottle at her head and pushing her into a wall while she was pregnant. *Id.* at 34-36.

Appellant's grandmother, Luckangelo, testified that Appellant lived with her upon his release from prison in October 2017. *Id.* at 39-40. Luckangelo testified that she had raised Appellant since he was two years old because his parents were drug addicts and unable to care for him. *Id.* at 40. She described Appellant's childhood as relatively stable until his father re-entered his life around the age of eight and Appellant started living with him. *Id.* at 40-41. According to Luckangelo, she has been sober for decades, and when she took Appellant to her sober meetings when he was younger, he started to perform the rapper Eminem's songs. *Id.* at 42. She

---

[9] On October 18, 2017, Punzo had filed a petition for temporary protection from abuse (PFA) against Appellant. The petition was granted, a temporary PFA order was entered against Appellant, and a hearing was scheduled for October 25, 2017. N.T., 11/6/2017, at 22-23. It appears Punzo sought the PFA order in response to the Facebook video. *See id.* at 19-27.

believed he related to Eminem because Eminem's mother was also a drug addict. *Id.* During this time, Appellant was using drugs and alcohol and running away from home. *Id.*

Next was Appellant's allocution, where he apologized to the court and said he "wasn't thinking when [he] released that video." *Id.* at 45. According to Appellant, the video was "just lyricism" but he admitted the lyrics were inappropriate. *Id.* Appellant also admitted he was using drugs and alcohol in the video. *Id.* at 46. Appellant said he was supposed to start working at a general contracting company the day he was arrested for violation of his probation. *Id.* at 47.

Based on the foregoing, the court stated the following to Appellant.

THE COURT: Okay. Well, I've reviewed this video, as painful a process that is. And what I see in this video, you're doing drugs, you're proud of it. You're boasting about how you're doing whatever you want to do despite what the Court ordered. Your comments reflect homicidal ideations and indirect terroristic threats toward the mother of your child....

*Id.* at 48-49. After reciting excerpts from the video transcript, the court went on to state that Appellant's statements in the video "reflect[] someone who is dangerous. [Appellant] admitted doing drugs, and quite proud of it as [he's] going along. Okay. That's a violation. Threatening people, that's a violation." *Id.* at 48-49. The court continued reciting excerpts from the video, and then stated to Appellant the following:

[Y]ou have violated the terms of my probation in multiple manners. I'm going to explain them for you. You did drugs. I warned you one hot urine you were supposed to be brought

- 9 -

before me, just one, and I warned you. I warned you.[10] So you take your newfound freedom and what do you do with it? You terrorized and harassed the mother of your child.

\*\*\*

Your behavior at a point in time where you had the opportunity to fly right, you take that opportunity to show absolute defiance to everything the Court ordered, defiance to this Judge. And you took the time and opportunity to terrorize [Punzo], all because you want what you want as you want it.

Well, guess what? That's homicidal ideations. You're a danger to the public. I'm finding this as fact. Absolute disrespect and defiance of this Court's supervision. Even though you spent three years in county [incarceration], that didn't impress you.

N.T., 11/6/2017, at 53-55.

At the conclusion of the hearing, the court revoked Appellant's probation, and deferred sentencing for the completion of a presentence investigation (PSI) report, a forensic intensive recovery (FIR) chemical dependency evaluation, and a mental health evaluation.

A sentencing hearing was held on January 4, 2018.[11] The court confirmed that it had reviewed Appellant's PSI report, chemical dependency

---

[10] **See** N.T., 10/10/2017, at 35 (trial court stating to Appellant "[w]hen in the future you have to make a decision as to do the right thing or do the wrong thing, you better have my face implanted in your memory, because trust me when I tell you, it will be. One misstep under my supervision[.] … I'm cautioning you right now. I'm not happy about these [guilty plea] negotiations, as you can well tell. And the reason I'm not happy because these negotiations is because this sentence to me is light. I understanding [*sic*] the reasoning that went into it, so I will accept the negotiations, but with this condition sir: that you better fly right from this point forward because there will be no further breaks.").

and mental health evaluations, and letters from Appellant's grandmother and his employer. N.T., 1/4/2018, at 8-9. The court also heard testimony from Appellant's mother, argument from defense counsel, and allocution from Appellant.

Appellant's counsel conceded Appellant violated his probation with his drug use and statements made in the Facebook video, but argued Appellant's family history of addiction played a role. *Id.* at 12-13. His counsel also acknowledged that Appellant's probation violations happened almost immediately upon his release from prison, but he highlighted Appellant's young age of 21 years, his earning a GED while incarcerated, his offer of employment, and his desire to see his child. *Id.* at 13, 18. Appellant's counsel argued the Facebook video was an "art form of rap" and Appellant could benefit from therapy as "a way to work out some of the things that [Appellant was] trying to express in a rap video in a more appropriate setting with a nonjudgmental professional." *Id.* at 17. Defense counsel requested Appellant be sentenced to an inpatient drug recovery facility. *Id.* at 14.

Appellant's mother confirmed that during Appellant's upbringing, "[h]e did not get his needs met the way that he should have. There's been substance abuse issues with me and his father for many years." *Id.* at 19-

---

[11] The court held sentencing hearings for Appellant and Farrell at the same time. Upon Farrell's second trial, a jury found him guilty of charged offenses on three dockets. *See* N.T., 1/4/2018, at 7.

20. She testified that she was clean, has been sober for several years, and is in college. *Id.* at 20. She described how, in the few days between Appellant's release from prison and his incarceration for violating probation, she saw signs of his being more responsible. Specifically, she testified that she helped Appellant obtain employment from his uncle, get his identification card from PennDOT, and sign up for a gym membership. *Id.* at 20-22. She also testified that she observed Appellant help an elderly woman in a wheelchair and donate money to a woman begging on the street. *Id.*

Next, the court turned its attention to Farrell's sentencing and heard argument from Farrell's counsel. Farrell's counsel compared Appellant's juvenile record to Farrell's lack thereof, and brought to the court's attention Appellant's convictions for simple assault and PIC in an unrelated case that occurred while Appellant was awaiting trial in the underlying incident. *Id.* at 28-30. At this point, Farrell's counsel moved for the admission of evidence of these convictions, to which Appellant's counsel objected and he moved to sever the sentencing hearings. *Id.* at 31. The court overruled the objection, denied the request for severance, and directed Farrell's counsel to focus his argument on Farrell, not Appellant. *Id.* at 32. The hearing continued with argument from Farrell's counsel, with Appellant's counsel renewing his severance motion, which was denied. The court again directed Farrell's counsel to proceed as to his client individually, and then noted the

distinction between Appellant's decision to plead guilty and Farrell's decision to proceed to trial. *Id.* at 35-37. When Farrell's counsel continued again to compare Appellant and other co-defendants' sentences to his client's situation, the Commonwealth objected. *Id.* at 38. The court permitted Farrell's counsel to place on the record the sentences of all co-defendants. *Id.* at 39-40. The court next heard testimony from Farrell's father and mother, argument from the Commonwealth relating to Farrell, and testimony from Bayer about the impact this incident has had on him. The court also reviewed victim impact letters.[12]

The Commonwealth then proceeded to argument on Appellant's violation of probation sentencing, seeking imposition of state sentences of incarceration to vindicate the court's authority. It focused on how Appellant immediately violated probation upon his release, the high likelihood that Appellant would reoffend if he were released, "his flagrant disregard for the authority of the [c]ourt," and his lack of remorse. *Id.* at 59-65. The Commonwealth further referred to portions of the PSI and chemical dependency and mental health reports to support its recommendation for a lengthy term of incarceration.

Next, after Farrell's allocution, the court heard Appellant's. Appellant apologized to the court and the Commonwealth for his actions and

---

[12] The court indicated at the hearing that counsel was "permitted to introduce the victim impact information into [Appellant's] sentencing as well. It applies to both [Farrell and Appellant]." N.T., 1/4/2018, at 48.

statements he made in the Facebook video. *Id.* at 65. He also apologized to the Victims and their families. *Id.* He stated the underlying incident was the "biggest regret" of his life, and denied stabbing any of the Victims. *Id.* at 65-66. He briefly referred to his juvenile adjudication for reckless burning, and highlighted that he had earned his GED while incarcerated and wanted to go to college and start employment. *Id.* at 66.

The court proceeded to place reasons on the record for Appellant's sentences. The court stated it remembered how Appellant was "smiling and joking around," during his revocation of probation hearing while the Facebook video was played, and noted that Appellant displayed "the same cavalier attitude" then as he had at his guilty plea hearing. *Id.* at 56. The court cited Appellant's "absolute lack of remorse that was exhibited … up until today." *Id.* at 67. The court continued as follows.

> Well, as to you, [Appellant], I do find that confinement is necessary here with respect to you. While these violations may be deemed technical, they were serious, and quite clearly, indicate that you intend wholeheartedly to commit crimes in the future. Most notably, the odds are very high. Your risk is very high for violent offenses in the future, not just any offenses, but violence.
>
> So I do believe that also you vividly demonstrated your complete disrespect of this [c]ourt's authority, and my sentence will reflect the necessity to vindicate that authority. With you, where do I begin? Well, the first thought that I vividly recall is how you were laughing as that video of your rapping, as you refer to it, was played. Big joke. Big joke. And how you smirked and your body language when [] Punzo, the mother of your child, [] was threatened by you within days of you being released from custody. Big joke. Big joke.

> I am aware, sir, after evaluating all the documents in reference to you that your upbringing also had severe difficulties that were not of your own making. Your parents and your grandmother were directly involved with that. It was acknowledged by mom. I'm also aware they will continue to support you in life to the extent that they can.

> ***

> You sat in custody, sir, for three years. That didn't impress you. You think this is a joke? I warned you. I warned you. I do not, I do not say things for the sake of saying things. Because I sensed in you the very day that you were given that gift, gift of the negotiated sentence, I actually was not sure that I was even going to accept those negotiations. Why, [Appellant]? Because the person who is seated across from me I could sense the lack of care about anybody but himself. And I sensed in you, and actually predicted, although I didn't think I would be that sure, that you would be back in front of me, so I took great pains, sir, to explain to you the conditions of your sentence and to implore you not to violate it.

*Id.* at 79-82.

The court incorporated into the record Appellant's criminal history docket, and noted the violent nature of the underlying incident and its disbelief of Appellant's claim that he had not stabbed any of the Victims. The court went on to state that,

> regardless of that, it is apparent to me, sir, that the extent that you threatened [] Punzo, the extent that you went to tag her on that video, the extent that you boasted about what you were doing and what you intended to do, it's been referred to as, oh, that's just rapping, that's just, you know, expressing one's self. Rapping like every other form of communication communicates the ideas of the person saying what they're saying, and what you said, sir, indicated to this [c]ourt someone of a mindset who would think nothing and who had plans to kill, harm, knife, shoot, use drugs, proclaim to be in possession of rocks, which is a common reference to cocaine, do drugs on the video, post that out for everyone in the world to see proudly. You were proud of

- 15 -

what you were doing, and what you were doing was saying fuck the Judge, fuck the probation officer, fuck everybody.

Your lack of understanding of the damage that you were doing and the impact of your actions is also reflected in the chemical dependency evaluation and forensic intensive recovery documents.

*Id.* at 83-84. The court went on to note Appellant's risk factors, as detailed in his evaluations, which could hinder any treatment process, the treatment he received as a juvenile, and how numerous attempts to rehabilitate him had failed. *Id.* at 84-86. The court next detailed at length and on the record the specific statements Appellant made during his Facebook video, *id.* at 87-95, and found Appellant's intent "to harm other human beings, quite clearly, including [Punzo] as well as anybody else that crosses [his] path, including whatever unfortunate police officer that [he] refer[s] to here." *Id.* at 88.

[] I get that some of this is bravado and you think this is cool and all of that good stuff and your immaturity is evident, I get that, but what you evidenced by your own words is that you have no regard whatsoever about anybody and that you will exert violence on anybody that crosses your path.

\*\*\*

I have no doubt in my mind sitting here, sir, that if I were to let you out any time soon that you will harm another human being. I'm not going to have that on my watch, not at all. So I can say quite clearly that a sentence of confinement that I will be directing that is in excess of the three years that you spent in, which obviously didn't impact your thought process at all, will be imposed for all of those reasons, and I incorporate the reasons of the Commonwealth as well and into each of your sentences as stated.

- 16 -

***Id.*** at 95-97.

The court imposed consecutive terms of 4 to 12 years of incarceration for each count of aggravated assault, with a concurrent term of 4 to 12 years of incarceration for conspiracy, and no further penalty for the PIC conviction. The aggregate term imposed on the three dockets was 12 to 36 years of incarceration.[13]

Appellant timely filed a motion for reconsideration of his sentences and recusal. A hearing was held on January 17, 2018. The court heard argument from Appellant's counsel and Appellant apologized to the court again. N.T., 1/17/2018, at 6-11. The court granted in part the motion for reconsideration, changing the term of 4 to 12 years of incarceration for aggravated assault on docket 4377-2014 to run concurrently with the remaining sentences. This resulted in a new aggregate term of 8 to 24 years of incarceration on the three dockets. The court denied the motion for reconsideration in all other respects, and denied the motion for recusal. ***Id.*** at 12, 21-24.

This timely-filed appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

---

[13] At the hearing, the court initially imposed an aggregate term of 8 to 24 years on the three dockets, but suddenly increased it to 12 to 36 years after Appellant apparently said "Fuck you" to the court after the sentences were imposed. N.T., 1/4/2018, at 101-04. Appellant's counsel objected on the record. ***Id.*** at 104. As discussed *infra*, after Appellant filed a motion for reconsideration of his sentences, the court resentenced him to an aggregate term of 8 to 24 years.

On appeal, Appellant presents the following five issues for our consideration.

1. Did the sentencing court err by revoking Appellant's probation for using marijuana and not allowing him to receive drug treatment?

2. Did the sentencing court err by revoking Appellant's probation for exercising his constitutional right to free speech in creating a rap video?

3. Did the sentencing court deprive Appellant of due process by denying his request for a severance?

4. Did the sentencing court err by considering impermissible conduct in imposing total confinement?

5. Did the sentencing court err in imposing a manifestly excessive and unreasonable sentence of total confinement for technical violations?

*See* Appellant's Brief at 5; Appellant's Supplemental Brief at 5.

In an appeal from a sentence imposed following the revocation of probation, we review the validity of the revocation proceedings, the legality of the sentence imposed following revocation, and any challenge to the discretionary aspects of the sentence imposed. ***Commonwealth v. Wright***, 116 A.3d 133, 136 (Pa. Super. 2015) (citation omitted). Additionally:

> The imposition of sentence following the revocation of probation is vested within the sound discretion of the trial court, which, absent an abuse of that discretion, will not be disturbed on appeal. An abuse of discretion is more than an error in judgment - a sentencing court has not abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

***Commonwealth v. Colon***, 102 A.3d 1033, 1043 (Pa. Super. 2014).

In his first issue, Appellant assails the trial court's decision to revoke his probation for his marijuana use but not allow him to receive drug treatment. Specifically, Appellant avers that his positive drug test was not a violation because he submitted to all drug tests as ordered and "was never given the opportunity to abide by the sentencing court's order and participate in the drug treatment recommendation." Appellant's Brief at 17; Appellant's Supplemental Brief at 17. According to Appellant, the trial court's decision to incarcerate Appellant in lieu of requiring him to comply with drug treatment violated public policy. Appellant's Supplemental Brief at 18.

In finding Appellant violated the terms of his probation, the trial court pointed to Appellant's positive drug test performed by his probation officer, as well as Appellant's admitted use of drugs and alcohol during the Facebook video. Rule 1925(a) Opinion, 2/14/2019, at 23 (citing N.T., 11/6/2017, at 46).

Probation may be revoked "upon proof of the violation of specified conditions of the probation." 42 Pa.C.S. § 9771(b). As detailed *supra*, there is no dispute Appellant failed his drug test while on probation, which was a specified condition of his probation. That probation condition specified as follows: "Drug screens: To submit to random drug/alcohol screens [-] Comply with All Treatment." Negotiated Guilty Plea Order of Sentence, 10/10/2017, at 1 (unnumbered). Appellant's argument that his positive drug

screen complies with the conditions of his probation because he submitted to the screen is inapposite; the point of the drug screen is to test for the presence of drugs in order to ensure Appellant is remaining drug-free, not to subject Appellant to unnecessary and inconsequential screening. Regarding treatment, the specified condition did not order Appellant to participate in a drug treatment program, and there is no evidence that any treatment was ordered at the time Appellant was released on probation. Regardless, the record does not reveal Appellant took any steps to indicate he was attempting to receive drug treatment, as he claims in his brief. Instead, Appellant stated he was about to start a job, and his mother testified about how she helped him with obtaining employment, his identification card, and a gym membership. Appellant relies on his chemical dependency evaluation to support his argument, which recommended Appellant receive intensive outpatient treatment. Appellant's Brief at 17-18; Appellant's Supplemental Brief at 17-18. However, this evaluation was ordered by the court on November 6, 2017, at Appellant's violation of probation hearing and prepared after he was found to have violated probation. Appellant's first issue merits no relief.

We next consider Appellant's claim that the court erred by revoking his probation for exercising his constitutional right to free speech. Appellant argues that the statements he made in his Facebook video were "freestyle rap" lyrics, a form of artistic expression protected by free speech.

Appellant's Brief at 26-27. According to Appellant, they were not intended to terrorize or intimidate. *Id.* at 26. First, he points out that he did not specifically mention Punzo's name, address, or other identifying information,[14] and second, he argues that even if he were referring to Punzo, he was "merely venting his frustrations" with "no intent of actually assaulting her." *Id.* at 26-27. He also claims there is no evidence Appellant tagged or instructed someone to tag Punzo in the video. *Id.* at 28. Further, he contends because "rap lyrics commonly contain references to drugs and violence," they were "generalized animosity" and did not reflect Appellant's intent to inflict harm on a particular person. *Id.* at 27. Appellant argues that he did not violate a specified condition of probation because the court "never ordered that he is not allowed to express himself by rapping." *Id.* at 28. Finally, Appellant argues that the court's ruling violates public policy by eroding free speech and chills future artistic expression based on a fear that one's lyrics may offend someone. Appellant's Supplemental Brief at 27.

"The First Amendment prohibits Congress from abridging the freedom of speech. This prohibition applies to the States through the Fourteenth Amendment." *Commonwealth v. Knox*, 190 A.3d 1146, 1153 (Pa. 2018) (citations omitted). "Nevertheless, expressive rights are not absolute." *Id.*

---

[14] We note that Appellant conceded he was referring to Punzo in his motion for reconsideration of his sentences. *See* Petition for Reconsideration of Sentence and Request for Recusal, 1/10/2018, at ¶ 10 ("[Punzo was also referenced negatively in the video for preventing [Appellant] from re-unifying with his child.").

- 21 -

at 1154 (citation and internal quotation marks omitted). "[S]peech which threatens unlawful violence can subject the speaker to criminal sanction." *Id.* at 1155 (citation omitted). "Threats of violence fall outside the First Amendment's protective scope because of the need to protect individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *Id.* (citation and internal quotation marks omitted). A court first reviews the content of the speech, and then assesses the speaker's intent, looking at contextual factors of "whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how the listeners reacted to the speech." *Id.* at 1158-59 (citation omitted). "The question of whether a statement constitutes a true threat is circumstance-dependent, [raising] a mixed question of fact and law." *Id.* at 1152. "Thus, we defer to the trial court's fact findings which are supported by competent evidence and resolve any legal questions, such as the scope of the true-threat doctrine, *de novo*." *Id.*

Here, the trial court reviewed the Facebook video, determined it contained threats, and found the evidence showed Appellant's statements reflected that he was referring to Punzo in the video, that he threatened to

harm her, and that he tagged[15] and messaged her on Facebook through a third-party (the videographer), and further, that the statements consisted of "multiple homicidal ideations" where he "bragged to a beat about how he enjoyed violently slicing people's throats using his pseudonym 'Slice and Tilt'" and "announced his intention to kill law enforcement personnel." Rule 1925(a) Opinion, 2/14/2019, at 25.

The record supports the court's factual findings that Appellant's statements in the Facebook video threatened violence, and that the threats were unconditional and communicated to Punzo via tagging and messaging on Facebook. Further, Punzo's history with Appellant, which the court found credible, gave Punzo reason to believe he had a propensity to engage in violence, and she immediately sought a PFA order, reflecting her belief that the threats were real. We conclude these findings established that Appellant communicated a true threat not protected by the First Amendment. Appellant's statements and the circumstances surrounding them, described in detail above, evidenced that they were threats, that Appellant communicated them knowing they would engender fear in Punzo, and that Appellant was not "merely venting" as he claims. Rather, Appellant, who had a history with Punzo, must have known the effect that his words would have upon her.

---

[15] Tagging refers to creating a link to the tagged person's social media profile, *e.g,* Facebook profile.

In **Knox**, our Supreme Court held Knox could be convicted of terroristic threats and witness intimidation based upon his rap song, where his lyrics fell within the true-threat exception to First Amendment protection. Knox had been criminally charged with these offenses, and the lyrics were used as evidence in proving Knox's guilt beyond a reasonable doubt. 190 A.3d at 1161. In contrast here, Appellant was not charged with new criminal offenses, but rather his Facebook video was used to determine whether he remained a suitable candidate for probation. As our Supreme Court noted,

> if this Court were to rule that [an appellant's] decision to use a stage persona and couch his threatening speech as "gangsta rap" categorically prevented the song from being construed as an expression of a genuine intent to inflict harm, we would in effect be interpreting the Constitution to provide blanket protection for threats, however severe, so long as they are expressed within that musical style. We are not aware of any First Amendment doctrine that insulates an entire genre of communication from a legislative determination that certain types of harms should be regulated in the interest of public safety, health, and welfare.

*Id.*

Finally, the trial court here considered the Facebook video for reasons other than Appellant's threats, *i.e.*, Appellant's drug use, contact with a Commonwealth witness, and disparagement of the court. Rule 1925(a) Opinion, 2/14/2019, at 25. In light of the foregoing, we conclude Appellant's video was not entitled to First Amendment protection and his claim does not merit relief.

- 24 -

Appellant next contends that the court deprived Appellant of due process by denying his severance request at his resentencing hearing. Appellant's Brief at 29. Severance decisions are generally within the trial court's discretion and will not be disturbed on appeal absent a manifest abuse of that discretion. *See Commonwealth v. Hannibal*, 156 A.3d 197, 230 (Pa. 2016). "[T]here is no constitutional right to an individual sentencing hearing, merely an individualized sentence, and where a defendant does not show he is prejudiced by a joint sentencing hearing we will not find a due process violation." *Commonwealth v. Simpson*, 66 A.3d 253, 275 n.27 (Pa. 2013).

Appellant contends that his January 4, 2018 resentencing hearing "was not done by a neutral and detached hearing body" because it was conducted at the same time as Farrell's sentencing hearing. Appellant's Brief at 29. He argues that Farrell's counsel "repeatedly attacked [Appellant's] character and argued aggravating factors in order to receive sentencing parity for [Farrell]." *Id.* at 29-30. He points to Farrell's counsel's introduction of evidence of Appellant's prior convictions while out on bail in the underlying incident and victim impact statements, testimony of one of the Victims, and argument that Appellant had lied to police. *Id.* at 30.

The trial court explained that it held Appellant and Farrell's hearings on the same day because the two men were joined by "the underlying set of circumstances," which "factually overlapped." Rule 1925(a) Opinion,

2/14/2019, at 30. The court expounded that it did not want to hold separate hearings to avoid duplicative evidence, specifically victim impact testimony. *Id.* at 30-31. The trial court also pointed out that Appellant's counsel did not object to holding the hearings on the same day until mid-hearing. *Id.* at 30. The trial court further stated that Appellant was not prejudiced because the notes of testimony from the January 4, 2018 hearing clearly indicated that the court considered, addressed, and stated reasons for the imposition of sentences for each defendant individually. *Id.* at 31. Finally, the court noted that Appellant's sentences were reconsidered individually during the January 17, 2018 reconsideration hearing, where it imposed a lesser sentence. *Id.*

The record shows that, despite two months' notice, Appellant did not raise an objection to the joint hearing at any time before it was held. At the conclusion of his November 6, 2017 violation of probation hearing, the court informed Appellant that his resentencing hearing would be held at the same time as Farrell's sentencing hearing. N.T., 11/6/2017, at 55 (court stating "[Y]ou're going to be back before me for sentencing on January 4th, I think is the day [] Farrell will be here for his sentencing. We'll make it the same day."). Further, when Appellant's counsel did object mid-hearing, he nonetheless agreed that he believed the court could evaluate each defendant individually. N.T., 1/4/2018, at 31 (Appellant's counsel stating "I have no doubt Your Honor can keep these things separate."). The record shows

- 26 -

several instances where the trial court limited attempts by Farrell's counsel to portray Appellant in a less favorable light than Farrell and made it clear that it was assessing Farrell and Appellant individually. *Id.* at 32, 35-37, 39. As detailed *supra*, the record demonstrates that Appellant and Farrell each offered individual mitigating factors, and the court stated independent reasons, separate from any factors raised by Farrell's counsel, for sentencing Appellant as it did. Finally, at the hearing on Appellant's motions for reconsideration and recusal, the court restated in detail its reasons for Appellant's sentences, *see* N.T., 1/17/2018, at 12-22; explained that in denying the motion to sever the hearings, the matters noted by Farrell's counsel were already in the record; and confirmed that the court "judge[s] each person [who] comes before [it] separately because they're different people." *Id.* at 22. Based on the foregoing, Appellant has not shown he was prejudiced by the joint hearing and thus, we do not find a due process violation or discern an abuse of discretion in declining to sever the hearings.

We next turn to Appellant's remaining issues that present challenges to the discretionary aspects of his sentences, which we consider mindful of the following.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

* * *

> When imposing [a] sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation.

*Commonwealth v. DiClaudio*, 210 A.3d 1070, 1074-75 (Pa. Super. 2019)

(quoting *Commonwealth v. Antidormi*, 84 A.3d 736, 760-61 (Pa. Super.

2014)).

> An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors:
>
> > (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

*DiClaudio*, 210 A.3d at 1075 (quoting *Commonwealth v. Samuel*, 102

A.3d 1001, 1006-07 (Pa. Super. 2014)).

Appellant has satisfied the first three requirements: he timely filed a

notice of appeal, preserved his issues in a post-sentence motion, and

included a Pa.R.A.P. 2119(f) statement in his brief. *See* Appellant's Brief at

15-16; Appellant Supplemental Brief at 15-16. Therefore, we now consider whether Appellant has raised a substantial question for our review.

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

**DiClaudio**, 210 A.3d at 1075 (citations and quotation marks omitted).

In his Pa.R.A.P. 2119(f) statement, Appellant contends (1) his sentences were manifestly excessive and disproportionate to his conduct; (2) the court "relied on improper factors[,] which were not supported by the evidence in finding him in violation and in determining the sentence[s];" (3) the court imposed a sentence of "total confinement following alleged technical probation violations absent any of the requirements provided by [subs]ection 9771(c)." Appellant's Brief at 15-16. In his supplemental brief, Appellant adds that the court exhibited prejudice, bias, and ill-will in imposing the sentence. Appellant's Supplemental Brief at 16.

We conclude Appellant has raised a substantial question with each of his claims. **Commonwealth v. Schutzues**, 54 A.3d 86, 98 (Pa. Super. 2012) ("An argument that the trial court imposed an excessive sentence to technical probation violations raises a substantial question."); **Commonwealth v. Pacheco**, 227 A.3d 358, 376 (Pa. Super. 2020) ("[A]n allegation that the court considered an impermissible sentencing factor

raises a substantial question."); ***Commonwealth v. Sierra***, 752 A.2d 910, 913 (Pa. Super. 2000) ("On appeal from a revocation proceeding, … a substantial question is presented when a sentence of total confinement, in excess of the original sentence, is imposed as a result of a technical violation of parole or probation."); ***Commonwealth v. Corley***, 31 A.3d 293, 297 (Pa. Super. 2011) ("An allegation of bias in sentencing implicates the fundamental norms underlying sentencing and ... raises a substantial question."). Accordingly, we review the merits of his claims.

Regarding sentences imposed following the revocation of probation, we observe the following.

> Upon revoking probation, a sentencing court may choose from any of the sentencing options that existed at the time of the original sentencing, including incarceration. [U]pon revocation [of probation] … the trial court is limited only by the maximum sentence that it could have imposed originally at the time of the probationary sentence. However, 42 Pa.C.S.[ ] § 9771(c) provides that once probation has been revoked, a sentence of total confinement may only be imposed if any of the following conditions exist[s]:
>
> > (1) the defendant has been convicted of another crime; or
> >
> > (2) the conduct of the defendant indicates that it is likely that he will commit another crime if he is not imprisoned; or
> >
> > (3) such a sentence is essential to vindicate the authority of the court.
>
> In addition, in all cases where the court resentences an offender following revocation of probation … the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the

sentence imposed [and f]ailure to comply with these provisions shall be grounds for vacating the sentence or resentence and resentencing the defendant. A trial court need not undertake a lengthy discourse[16] for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender.

*Colon*, 102 A.3d at 1044 (citations and quotation marks omitted).

Moreover, in addition to these considerations, a trial court must also consider the factors set forth in subsection 9721(b)[17] when imposing a sentence following the revocation of probation. *Commonwealth v. Derry*, 150 A.3d 987, 995 (Pa. Super. 2016).

We initially address Appellant's contention that the trial court erred by considering impermissible conduct in sentencing Appellant after revocation

---

[16] As our Supreme Court has explained:

Simply put, since the defendant has previously appeared before the [trial] court, the stated reasons for a revocation sentence need not be as elaborate as that which is required at initial sentencing. The rationale for this is obvious. When sentencing is a consequence of the revocation of probation, the trial judge is already fully informed as to the facts and circumstances of both the crime and the nature of the defendant[.]

*Commonwealth v. Pasture*, 107 A.3d 21, 28 (Pa. 2014).

[17] That subsection provides, in relevant part, that when imposing a judgment of sentence,

the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S. § 9721(b).

of his probation. Specifically, Appellant claims on appeal that the court improperly considered (1) Appellant's juvenile record, (2) that Appellant "must have stabbed the [V]ictims because of a cut on his hand" when he was arrested, (3) his prior conviction in an unrelated incident while on bail for the underlying offenses, and (4) victim impact evidence. Appellant's Brief at 32-33. Appellant relies on ***Commonwealth v. Carver***, 923 A.2d 495 (Pa. Super. 2007).[18]

In ***Carver***, Carver pleaded guilty to offenses and was sentenced to a probationary term of 10 years. He was later arrested for violating the terms of his probation when he failed a drug test. At his revocation hearing, the court revoked Carver's probationary term and "in imposing a sentence of imprisonment, it relied **solely** upon the fact that [Carver] had committed another crime the day before [his re-]sentencing." 923 A.2d at 496 (emphasis added). In only relying on conduct indicating Carver was likely to commit another crime if not imprisoned, the trial court specifically stated

---

[18] In its supplemental brief, the Commonwealth clarifies that it does not oppose a limited remand, pursuant to ***Carver***, for the court to determine whether Appellant's conduct while under the court's supervision warranted revocation because at the **revocation hearing** the court considered certain conduct that did not violate specific terms of probation or new crimes committed. Commonwealth's Supplemental Brief at 19-24. Appellant does not make this argument in either of his briefs. Rather, as noted hereinabove, he argues impermissible factors were considered at the **sentencing hearing**. Had Appellant raised the Commonwealth's argument, he may have had a meritorious argument. However, Appellant does not raise or develop this claim, and it is well-settled that this Court "will not become the counsel for an appellant and develop arguments on an appellant's behalf[.]" ***Commonwealth v. Miller***, 212 A.3d 1114, 1131 (Pa. Super. 2019) (citations omitted). Accordingly, we do not address this claim further.

that it was not considering whether a sentence of total confinement was necessary to vindicate the authority of the court. *Id.* at 498. Because the trial court relied solely on Carver's pre-sentence conduct, this Court reversed, explaining that the "trial court ha[d] not considered whether the failed urine test, in and of itself, warrant[ed] revocation or whether probation [could] remain an effective means of rehabilitation if other measures, such as drug rehabilitation efforts, [we]re employed." *Id.* The Court remanded for another revocation hearing to determine whether Carver's probationary conduct warranted revocation. *Id.* at 499.

We begin by pointing out that Appellant failed to raise challenges to the introduction of his juvenile record and reference to the cut on his hand at re-sentencing or in a post-sentence motion. Accordingly, they are waived.[19] *See DiClaudio*, *supra*.

With respect to Appellant's prior conviction and victim impact evidence, the record shows these factors were not raised at Appellant's revocation hearing; rather, they were raised by Farrell's counsel at the joint re-sentencing hearing and Appellant's objection to the court's consideration

---

[19] In his supplemental brief, Appellant argues that these issues implicate the legality of his sentence and are therefore cannot be waived. Appellant's Supplemental Brief at 30 (citing *Commonwealth v. Foster*, 17 A.3d 332 (Pa. 2011), for the proposition that "a plurality of [our] Supreme Court [] held that the defendant did not waive a challenge to his sentence based on an interpretation of a mandatory minimum statute"). *Foster* is inapplicable in Appellant's case as he is not challenging the interpretation of a mandatory minimum statute; he is challenging the court's consideration of allegedly improper factors – a claim that goes to the discretionary aspects of sentencing, and thus must be preserved below. *See, e.g., Pacheco, supra*.

of these factors was in the context of his motion to sever the proceedings. In contrast to **Carver**, Appellant's prior conviction and victim impact evidence did not serve as the basis for determining whether probation warranted revocation. Instead, as detailed above, the court relied upon Appellant's failed drug test, the threats and "homicidal ideations" in his Facebook video, which showed his propensity for violence, his open and admitted drug use during the video, his failure to take seriously the court's warning at his guilty plea and sentencing hearing that "one hot urine" would result in a violation, and his disrespect and defiance of the court as the bases for finding Appellant in violation of his probation.

Appellant points to the **Carver** Court's statement that 42 Pa.C.S. § 9771(d) "clearly restrains the court from considering facts occurring prior to the imposition of probation…." Appellant's Brief at 32, *quoting* **Carver**, 923 A.2d at 497. However, the entire sentence from which Appellant quotes is that subsection 9771(d) "clearly restrains the court from considering facts occurring prior to the imposition of probation **when revoking probation**." **Carver**, 923 A.2d at 497 (emphasis added). As the trial court did not consider such facts when it revoked Appellant's probation, we find his argument unavailing.

Finally, Appellant argues that his sentences of total confinement violated 42 Pa.C.S. § 9771(c) because he was not convicted of another crime, his conduct did not indicate he is likely to commit a crime if he is not

incarcerated, and total confinement was not necessary to vindicate the authority of the court. Appellant's Brief at 35-36. Appellant also claims that his sentences are unreasonable and "grossly disproportionate" to his technical violations of probation, and that the trial court exhibited prejudice in its references to Appellant's juvenile record and his requesting visitation while in custody by his toddler child.[20] *Id.* at 38-39;[21] Appellant's Supplemental Brief at 34-35.

Appellant argues the trial court abused its discretion because Appellant has a drug dependency; he did not threaten anyone, take any steps to carry

---

[20] Appellant also argues in this section of his brief that the court exhibited "prejudice, bias and ill-will" when it suddenly increased his aggregate sentence after Appellant expressed his discontent with the court's imposition of sentences. Appellant's Brief at 40. Appellant, citing *Commonwealth v. Lucky*, 229 A.3d 657 (Pa. Super. 2020) (remanding because under the circumstances of the case there was a potential for an appearance of bias by the sentencing judge), argues that he is entitled to a remand because like Lucky, the same judge increased his sentence following an expression of disagreement, "regardless of whether it was reconsidered." Appellant's Supplemental Brief at 36. We disagree. As noted *supra*, the court later reconsidered his sentences and re-imposed the original aggregate sentence. We find this distinction from *Lucky* significant. Accordingly, this argument is moot.

[21] Additionally, Appellant argues in this section of his brief, but does not include it in his Rule 2119(f) statement, that the court failed to consider carefully Appellant's rehabilitative needs. *See* Appellant's Brief at 39. Such a claim does not raise a substantial question. *See*, *e.g.*, *Commonwealth v. Griffin*, 65 A.3d 932, 936-37 (Pa. Super. 2013) (collecting cases). In any event, the trial court had the benefit of a PSI report and is thus presumed to have considered all relevant factors. *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. 2004) ("[W]here the sentencing judge had the benefit of a [PSI] report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.").

out any threats, possess a weapon, assault anyone, or sell drugs; he recognized his poor judgment, apologized for his actions, and expressed remorse; it was his first probation violation; his violations were technical; he had obtained employment; and he had not incurred a new arrest. ***Id.*** at 35-36, 38-39.

In addressing this claim, the trial court stated that Appellant's general, "blanket" claim of excessiveness did not raise a substantial question, but even if it did, the court explained that it did not abuse its discretion because it determined Appellant to be "a likely candidate for violent recidivism," deemed him "to be a danger to the community," found his conduct on probation triggered the need to vindicate the court's authority, and imposed reasonable sentences. Rule 1925(a) Opinion, 2/14/2019, at 31-39. The court noted the maximum period of incarceration for each aggravated assault conviction is 10 to 20 years, and the maximum aggregate term of incarceration Appellant could have received is 45 to 85 years. ***Id.*** at 33. The court added that it considered relevant factors, as detailed *supra*, and sentenced Appellant within the standard range of the sentencing guidelines. ***Id.*** at 31-39. The court further noted that it decided to impose consecutive sentences in recognition of the "individualized suffering of three separately attacked victims." ***Id.***

Upon review, we discern no abuse of discretion. After entering his guilty pleas, Appellant initially received mitigated-range sentences and the

bulk of his sentences were probationary in nature. Nonetheless, Appellant failed to abide by the conditions imposed on him, and the trial court, upon revoking his probation, imposed lengthier sentences within statutory bounds. Our Supreme Court has explained that

> a trial court does not necessarily abuse its discretion in imposing a seemingly harsher post-revocation sentence where the defendant received a lenient sentence and then failed to adhere to the conditions imposed on him. In point of fact, where the revocation sentence was adequately considered and sufficiently explained on the record by the revocation judge, in light of the judge's experience with the defendant and awareness of the circumstances of the probation violation, under the appropriate deferential standard of review, the sentence, if within the statutory bounds, is peculiarly within the judge's discretion.

**Pasture**, 107 A.3d at 28-29 (citation omitted).

With respect to Appellant's claim of bias,

> [o]ur Supreme Court has stated that it presumes that judges of this Commonwealth are "honorable, fair and competent," and vests in each jurist the duty to determine, in the first instance, whether he or she can preside impartially. **Commonwealth v. White**, 734 A.2d 374, 384 (Pa. 1999).
>
> * * *
>
> The sentencing decision is of paramount importance in our criminal justice system, and must be adjudicated by a fair and unbiased judge. **Commonwealth v. Knighton**, 415 A.2d 9 (Pa. 1980). This means[] a jurist who "assesses the case in an impartial manner, free of personal bias or interest in the outcome." **Commonwealth v. Abu-Jamal**, 720 A.2d 79, 89 (Pa. 1998). Because of the tremendous discretion a judge has when sentencing, "a defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned." **Commonwealth v. Darush**, 459 A.2d 727, 732 (Pa. 1983). "A tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is

> sufficient to warrant the grant of new proceedings." ***In Interest of McFall***, 617 A.2d 707, 714 (Pa. 1992).

***Lucky***, 229 A.3d at 665 (citations altered; some citations omitted).

As detailed *supra*, the record here confirms that the trial court, who had already presided over Appellant's prior hearings, was cognizant of and considered a myriad of factors before imposing fully-informed sentences following the revocation of his probation. The court explained its reasoning on the record and based its sentences on Appellant's drug use and threatening conduct during the Facebook video, which it found indicated a high risk of committing future violent offenses, "complete disrespect" for the court's authority, lack of remorse, lack of understanding of the impact of his actions, failure to take his sentence seriously, "cavalier attitude," failure to heed the court's warning at his original sentencing to keep himself out of trouble, failure to rehabilitate himself when given the opportunity, including his three-year stay in county prison awaiting trial in the underlying cases, family upbringing, immaturity, criminal history, violent nature of the underlying offense, PSI report, and mental health and chemical dependency evaluations. The court made clear that its sentence of total confinement was based upon a finding that Appellant's conduct "indicates that it is likely that he will commit another crime if he is not imprisoned" and was "essential to vindicate the authority of the court." 42 Pa.C.S. § 9771(c). We are satisfied that the court made the requisite finding prescribed under this subsection. Moreover, the length of incarceration was within the trial court's discretion

and statutory limits. Finally, under the circumstances detailed herein we do not see a potential for an appearance of bias, partiality, prejudice, or ill-will by the trial court. Accordingly, Appellant's claims are without merit.

In light of the foregoing, because the trial court's findings are supported by the record, free of the appearance of bias, and evidence due consideration by the trial court about the specific needs of Appellant, we conclude the trial court did not abuse its discretion in sentencing Appellant. The court found probation to be ineffective in rehabilitating Appellant, and prison sentences were necessary to vindicate the authority of the court. *See Commonwealth v. Mouzon*, 812 A.2d 617, 620 (Pa. 2002) ("Traditionally, the trial court is afforded broad discretion in sentencing criminal defendants 'because of the perception that the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.'") (citation omitted).

Because Appellant has failed to demonstrate that he is entitled to relief on any of his claims, we affirm Appellant's judgments of sentence.

Judgments of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/11/2020*